# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF VIRGINIA

# ALEXANDRIA DIVISION

| | |
|---|---|
| RUBY LAMBERT, individually and on behalf of all others similarly situated, | Case No. 1:19-cv-00103-LO-MSN |
| Plaintiff, | |
| v. | |
| NAVY FEDERAL CREDIT UNION, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NAVY FEDERAL CREDIT

## UNION'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

D. Bradford Hardin, Jr., VSB 76812
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006-3401
Tel.:    (202) 973-4238
Facsimile: (503) 973-4438
Email: bradfordhardin@dwt.com

Fred Burnside (*pro hac vice*)
Rebecca J. Francis (*pro hac vice*)
920 Fifth Ave., Suite 3300
Seattle, WA 98104
Tel.:    (206) 622-3150
Emails: fredburnside@dwt.com
          rebeccafrancis@dwt.com

*Counsel for Navy Federal Credit Union*

Dated:  April 1, 2019

# TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.   FACTUAL BACKGROUND ....................................................................................... 2

  A.   Navy Federal Credit Union ........................................................................... 2

  B.   Ms. Lambert and Her NSF Fees ................................................................... 3

  C.   ACH Debit Transactions ................................................................................ 3

  D.   Ms. Lambert's ACH Debit Transactions and the Important Disclosures ............. 6

  E.   Ms. Lambert's Claims ................................................................................... 7

III.   ARGUMENT .......................................................................................................... 8

  A.   Federal Law Preempts Ms. Lambert's Claims Because She Seeks to Use Them to Regulate Navy Federal's Disclosures and Fees. .................................................. 9

  B.   In any Event, Ms. Lambert's Breach of Contract and Duty of Good Faith and Fair Dealing Claims Fail as a Matter of Law. ............................................................ 15

    1.   Ms. Lambert's Agreement with Navy Federal Expressly Provides for the NSF Fees in this Case, Defeating any Contract Claim. ........................... 15

    2.   Navy Federal Complied With the Duty of Good Faith and Fair Dealing. 20

      a.   Navy Federal Acted Consistent With the Important Disclosures. 20

      b.   Navy Federal Exercised Accrued Contractual Rights. ................. 22

  C.   Even if Not Preempted, Ms. Lambert's UDTPA Claim Fails. ............................ 24

    1.   Virginia Law Applies, Barring Application of North Carolina Law. ....... 24

    2.   Navy Federal Did Not Act Unfairly or Deceptively When It Complied with the Disclosures. ................................................................................ 27

    3.   Ms. Lambert's UDTPA Claim Fails Because She Bases It on a Breach of Contract Theory, Which Cannot Suffice to State a Claim. ...................... 28

IV.   CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*AdvanFort Co. v. Int'l Registries, Inc.*,
   2015 WL 2238076 (E.D. Va. 2015), *amended on other grounds* 2015 WL
   4254988 (E.D. Va. 2015) ....................................................................................... 2-3

*Affinion Benefits Grp. LLC v. Econ-O-Check Corp.*,
   784 F. Supp. 2d 855 (M.D. Tenn. 2011) ...................................................................5

*Albayero v. Wells Fargo Bank, N.A.*,
   2011 WL 4748341 (E.D. Va. 2011) ..........................................................................20

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008) ....................................................................................................9

*Andrichyn v. TD Bank, N.A.*,
   93 F. Supp. 3d 375 (E.D. Pa. 2015) ...................................................................4, 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................8

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ................................................................................................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................21

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) .............................................................................29, 30

*In re Buffalo Coal Co.*,
   2010 WL 724702 (Bankr. N.D.W.V. 2010) ..............................................................23

*Campbell v. Digital Fed. Credit Union*,
   No. 1:19-cv-10389-LTS (D. Mass.) ...........................................................................5

*Carolina Rest. Grp., Inc. v. PepsiCo Sales, Inc.*,
   2015 WL 4250395 (W.D.N.C. 2015) .......................................................................29

*Costoso v. Bank of Am., N.A.*,
   74 F. Supp. 3d 558 (E.D.N.Y. 2015) .........................................................................5

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ..................................................................................................9

*Cyberlock Consulting, Inc. v. Info. Experts, Inc.*,
    876 F. Supp. 2d 672 (E.D. Va. 2012) ...................................................25

*D.L. ex rel K.L. v. Baltimore Bd. of Sch. Com'rs*,
    706 F.3d 256 (4th Cir. 2013) .............................................................14

*Davis v. State Farm Life Ins. Co.*,
    163 F. Supp. 3d 299 (E.D.N.C. 2016)..................................................29

*De Vera v. Bank of Am., N.A.*,
    2012 WL 2400627 (E.D. Va. 2012).................................................20, 21

*Dickenson-Russell Coal Co., LLC v. Sec'y of Labor*,
    747 F.3d 251 (4th Cir. 2014) .............................................................17

*Donmar Enters., Inc. v. S. Nat'l Bank of N.C.*,
    64 F.3d 944 (4th Cir. 1995) ...............................................................10

*Eisenberg v. Wachovia Bank, N.A.*,
    301 F.3d 220 (4th Cir. 2002) .............................................................10

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)...........................................................................9

*Freedman v. Am. Online, Inc.*,
    325 F. Supp. 2d 638 (E.D. Va. 2004) ..............................................26, 27

*Fultz v. World Savs. & Loan Ass'n*,
    2008 WL 4131512 (W.D. Wash. 2008)................................................15

*Gutierrez v. Wells Fargo Bank, N.A.*,
    704 F.3d 712 (9th Cir. 2012) ...........................................................9, 13

*Hawthorne v. Umpqua Bank*,
    2013 WL 5781608 (N.D. Cal. 2013) ...................................................10

*Hitachi Credit Am. Corp. v. Signet Bank*,
    166 F.3d 614 (4th Cir. 1999) .........................................................25, 26

*Howards v. Fifth Third Bank*,
    No. 1:18-cv-00869-MRB (C.D. Cal.) ................................................., 6

*Jones v. United Commt'y Bank, Inc.*,
    No. 3:18-cv-00190-HSM-HBG (E.D. Tenn.) ......................................5-6

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941)..........................................................................24

*Land & Marine Remediation, Inc. v. BASF Corp.*,
  2012 WL 2415552 (E.D. Va. 2012)........................................................ 22-23

*Lossia v. Flagstar Bancorp, Inc.*,
  895 F.3d 423 (6th Cir. 2018) ...............................................................4, 6

*Mann v. TD Bank, N.A.*,
  2009 WL 3818128 (D.N.J. 2009) ...........................................................10

*McInnis v. BAC Home Loan Servicing, LP*,
  2012 WL 383590 (E.D. Va. 2012)...........................................................20

*McNeil v. Capital One Bank, N.A.*,
  No. 1:19-cv-00473-FB-RER (E.D.N.Y.) ...................................................5

*McPike v. Zero-Gravity Holdings, Inc.*,
  280 F. Supp. 3d 800 (E.D. Va. 2017) .....................................................25

*Microstrategy, Inc. v. Bus. Objects, S.A.*,
  331 F. Supp. 2d 432 (E.D. Va. 2004), *aff'd* 429 F.3d 1344 (4th Cir. 2006)...........................17

*Monton v. Am. Servicing Co.*,
  2012 WL 3596519 (E.D. Va. 2012)........................................................20, 24

*Navy Fed. Credit Union v. LTD Fin. Servs., Inc.*,
  2019 WL 1272531 (E.D. Va. 2019)...........................................................8

*Nelson v. ENT Credit Union*,
  No. 1:19-cv-00634-CMA-KMT (D. Colo.) ...............................................6

*Perks v. TD Bank, N.A.*,
  No. 1:18-CV-11176-DAB (S.D. N.Y) .......................................................5

*Perry v. Meredith Corp.*,
  77 Fed. App'x 128 (4th Cir. 2003) ........................................................28

*Pyott–Boone Elecs. Inc. v. IRR Trust for Donald L. Fetterolf Dated Dec. 9, 1997*,
  918 F. Supp. 2d 532 (E.D. Va. 2013) .....................................................27

*Repub. Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) ...............................................................8

*Rose v. Chase Bank USA, N.A.*,
  513 F.3d 1032 (9th Cir. 2008) ...........................................................10, 13

*Run Them Sweet, LLC v. CPA Glob. Ltd.*,
  224 F. Supp. 3d 462 (E.D. Va. 2016) .................................................25, 26, 27

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands,*
    *LLC*,
    713 F.3d 175 (4th Cir. 2013) ...............................................................15

*Saturn Distr. Corp. v. Williams*,
    905 F.2d 719 (4th Cir. 1990) ...............................................................24

*Stoney Glen, LLC v. S. Bank & Trust Co.*,
    944 F. Supp. 2d 460 (E.D. Va. 2013), *clarified on den. recon.* 2013 WL
    4539736 (E.D. Va. 2013) ............................................................... *passim*

*In re TD Bank, N.A.*,
    150 F. Supp. 3d 593 (D.S.C. 2015)..........................................10, 13, 14

*Travelers Indem. Co. v. Portal Healthcare Sols., LLC*,
    35 F. Supp. 3d 765 (E.D. Va. 2014) ......................................................17

*Va. Elec. & Power Co. v. Bransen Energy, Inc.*,
    850 F.3d 645 (4th Cir. 2017) ...............................................................16

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.*,
    156 F.3d 535 (4th Cir. 1998) ...............................................................23

*Valperga v. Bank of Am., N.A.*,
    No. 3:18-cv-06724-RS (N.D. Cal.) .........................................................5

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007)..................................................................................9

*Whittington v. Mobiloil Fed. Credit Union*,
    2017 WL 6988193 (E.D. Tex. 2017), *appeal pending* No. 18-41101 (5th Cir.) ............. *passim*

*Wilmington Shipping Co. v. New England Life Ins. Co.*,
    496 F.3d 326 (4th Cir. 2007) ...............................................................10

*Zaklit v. Glob. Linguist Sols., LLC*,
    2014 WL 3109804 (E.D. Va. 2014).......................................................25

**State Cases**

*Charles E. Brauer Co. v. Nations Bank of Va., N.A.*,
    251 Va. 28, 466 S.E.2d 382 (1996)........................................................21

*Erie Ins. Exch. v. EPC MD 15, LLC*,
    822 S.E.2d 351 (Va. 2019)..............................................................17, 19

*Gay v. Peoples Bank*,
  2015 WL 3650090 (N.C. Super. 2015), *aff'd*, 247 N.C. App. 397, 786 S.E.2d
  433 (2016) ................................................................................................28

*Gaynoe v. First Union Corp.*,
  153 N.C. App. 750, 571 S.E.2d 24 (2002) ..........................................................28

*Gray v. N.C. Ins. Underwriting Assocs.*,
  352 N.C. 61, 529 S.E.2d 676 (2000) ..........................................................29, 30

*Squire v. Virginia Hous. Dev. Auth.*,
  287 Va. 507, 758 S.E.2d 55 (2014) ..........................................................16

*Wilson v. Holyfield*,
  227 Va. 184, 313 S.E.2d 396 (1984) ..........................................................16, 19

**Federal Statutes**

12 U.S.C. § 1766(a) ................................................................................10

12 U.S.C. § 4301(a) ................................................................................11

12 U.S.C. § 4301(b) ................................................................................10

12 U.S.C. § 4311 ....................................................................................10

28 U.S.C. § 1332(a) ................................................................................8

28 U.S.C. § 1332(c) ................................................................................8

28 U.S.C. § 1332(d)(2)(A) ..........................................................................8

**State Statutes**

N. Car. General Statute § 75–1.1 ..................................................................29, 30

Va. Code Ann. § 8.3A-501 ..........................................................................18

**Rules**

Rule 12(b)(6).................................................................................. *passim*

**Regulations and Regulatory Materials**

12 C.F.R. § 107(6) ..................................................................................14

12 C.F.R. § 701 ....................................................................................11

12 C.F.R. § 701.1 ..................................................................................13

12 C.F.R. § 701.35 .................................................................................1, 9, 11, 14

12 C.F.R. § 701.35(a)-(b)...........................................................................11

12 C.F.R. § 701.35(c)..................................................................11, 12, 13, 15

12 C.F.R. § 701.35(d) ................................................................................11

12 C.F.R. § 707 .........................................................................................11

12 C.F.R. § 707.1 ................................................................................. *passim*

12 C.F.R. § 707.4(b)(4)..............................................................................12

49 Fed. Reg. 46552-01 ...........................................................................2, 11

**Other Authorities**

*ACH Operations Bulletin #1-2014: Questionable ACH Debit Origination: Roles and Responsibilities of ODFIs and RDFIs*, NACHA (Sept. 30, 2014), *available at* https://www.nacha.org/news/ach-operations-bulletin-1-2014-questionable-ach-debit-origination-roles-and-responsibilities#_ftnref27................................5

Consumer Finance Protection Bureau (Mar. 25, 2019), *available at* https://www.consumerfinance.gov/about-us/blog/your-checking-accounts-questions-answered/.................................................................................22

https://www.marketwatch.com/press-release/navy-federal-named-best-in-class-brand-for-customer-experience-2018-06-19 ...............................................3

https://www.navyfederal.org/about/about.php...............................................2

https://www.navyfederal.org/about/code-of-ethics.php.................................2

*Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/each ..................................................................17

*Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/return ................................................................17

NACHA, https://www.nacha.org/rules/ .........................................................4

Nat'l Credit Union Admin. at 1 (Apr. 1, 2007), *available at* https://www.ncua.gov/files/legal-opinions/OL2006-1214.pdf ...............13

Nat'l Credit Union Admin. at 1 (Aug. 7, 2007), *available at* https://www.ncua.gov/files/legal-opinions/OL2007-0743.pdf ...............13

Nat'l Credit Union Admin. at 2 (Sep. 14, 1998), *available at*
https://www.ncua.gov/files/legal-opinions/OL1998-0433.pdf ...............................................14

Nat'l Credit Union Admin. at 3 (Feb. 10, 2004), *available at*:
https://www.ncua.gov/files/legal-opinions/OL2004-0147.pdf ................................................2

Nat'l Credit Union Admin. (Mar. 12, 2004), *available at*
https://www.ncua.gov/files/legal-opinions/OL2004-0259.pdf ...............................................14

Webster's 3d New Int'l Dict. (2002) ...................................................................... 17-18

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Rudy Lambert admits Defendant Navy Federal Credit Union ("Navy Federal") properly assessed a non-sufficient funds fee ("NSF fee") when her account had insufficient funds for her insurance payment to Mutual of Omaha.  But she complains Navy Federal wrongfully assessed a second NSF fee when Mutual of Omaha made another payment request two days later and her account still had insufficient funds.  *See* Compl. ¶¶ 22-25, 33 [Dkt. 1].  She challenges the second NSF fee by claiming Navy Federal's account disclosures "indicat[e]" that a "single" NSF fee will be assessed only "once per transaction or item—defined as a customer request for payment or transfer."  *Id.* ¶¶ 3, 29.  But no such definition appears in the account disclosures, and Ms. Lambert points to *no* language promising that Navy Federal will assess an NSF fee only "once," regardless of the number of times her insurer requests payment.  Yet Ms. Lambert presses on, asserting claims for (a) breach of contract and of the duty of good faith and fair dealing under Virginia law; and (b) violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA").  This Court should dismiss Ms. Lambert's claims for three reasons:

*First*, federal law preempts Ms. Lambert's state law claims because she seeks to use them to dictate disclosures and fee practices, thereby interfering with Navy Federal's exercise of its powers as a federally-chartered credit union under 12 C.F.R. §§ 707.1 & 701.35.

*Second*, Ms. Lambert's contract-based claims fail because Navy Federal unambiguously disclosed it assesses a fee for "*each returned debit item*," meaning "each" payment request "returned" for insufficient funds, without regard to the end-purpose for the request.

*Third*, Ms. Lambert's UDTPA claim fails because:  (1) the Virginia choice of law provision in the disclosures bars her claim; (2) the parties' contract authorized Navy Federal to assess the NSF fees at issue; and (3) Ms. Lambert alleges at most a simple breach of a contract claim, which does not suffice to state a UDTPA claim.

1

## II. FACTUAL BACKGROUND

### A. Navy Federal Credit Union

Navy Federal is a federally-chartered, member-owned, not-for-profit credit union, whose mission is to "serv[e] the military and their families" by providing banking, lending, and credit services to its members.[1]  *See also* Compl. ¶ 13.  Unlike banks, "[c]redit unions are nonprofit cooperatives, owned by their members and democratically controlled, that may only lend and pay dividends to their members and, as such, *are disinclined by their nature and structure to engage in the kinds of practices regarded as predatory or abusive*."[2]  Consistent with this philosophy, Navy Federal strives to "act with the highest degree of integrity," Compl. ¶ 4 (quoting https://www.navyfederal.org/about/code-of-ethics.php), taking pride in its "good name and reputation," and working to provide "the highest level of service" to its member-owners.[3]  Navy Federal has done so since 1933, when it was founded with seven members; today, it has grown to more than eight million members.[4]  Navy Federal's commitment to serving its members has earned it recognition for being "Best-in-Class" for Customer Experience.[5]

---

[1] *See* https://www.navyfederal.org/about/code-of-ethics.php (cited in Compl. ¶ 4).  On a motion to dismiss under Rule 12(b)(6), this Court may consider documents attached to the complaint, "documents central to a plaintiff's claim, and documents sufficiently referred to in the complaint, so long as the authenticity of these documents is not disputed."  *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 464 (E.D. Va. 2013), *clarified on den. recon.* 2013 WL 4539736 (E.D. Va. 2013).  Thus, this Court may consider Navy Federal's website, which Ms. Lambert cites in her Complaint, as well as Navy Federal's Important Disclosures ("Important Disclosures"), Schedule of Fees and Charges ("Fee Schedule"), and Online Banking Application documents, which Ms. Lambert attaches to her Complaint.  Compl. ¶ 4 & Exs. A-C.

[2] *NCUA Opinion Letter 04-0147*, Nat'l Credit Union Admin. at 3 (Feb. 10, 2004), *available at*: https://www.ncua.gov/files/legal-opinions/OL2004-0147.pdf (emphasis added).  *See Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193, *7 (E.D. Tex. 2017) (courts give deference to an "agency's considered opinions as set forth in interpretive letters"), *appeal pending* No. 18-41011 (5th Cir.); *see also* 49 Fed. Reg. 46552-01 ("[U]nlike other financial institutions, [federal credit unions] are controlled by their membership.").

[3] https://www.navyfederal.org/about/code-of-ethics.php (cited in Compl. ¶ 4).

[4] *See* https://www.navyfederal.org/about.php.

[5] *See* https://www.marketwatch.com/press-release/navy-federal-named-best-in-class-brand-for-customer-experience-2018-06-19. *See AdvanFort Co. v. Int'l Registries, Inc.*, 2015 WL 2238076,

**B.      Ms. Lambert and Her NSF Fees**

Ms. Lambert alleges she "is a citizen of North Carolina who maintains an NFCU

checking account," which she admits is governed by Navy Federal's "Important Disclosures."

Compl. ¶¶ 3, 12 & Ex. A.[6]  The Important Disclosures provide:  "Navy Federal may return debits

to the checking account (e.g. an ACH payment) if the amount of the debit exceeds funds

available in the checking account.  A fee may be assessed in the amount shown on Navy

Federal's current *Schedule of Fees and Charges* for *each returned debit item*."  Compl., Ex. A at

4 (second emphasis added).  The Schedule of Fees and Charges lists the "Non-sufficient funds

fee for checks and ACH Debit" as $29.00.  Compl., Ex. B at 1.  Ms. Lambert alleges that on

October 16, 2018, she "attempted a $96.66 insurance payment to Mutual of Omaha," but had

"insufficient funds in [her] account," so Navy Federal "charged her a $29 NSF Fee."  *Id.* ¶¶ 22-

23.  She agrees this fee complies with Navy Federal's Important Disclosures.  *Id.*  But she alleges

that "without her request *to NFCU* to retry the transaction," "NFCU processed the same

transaction" on October 18, 2018.  *Id.* ¶ 24 (emphasis added).  She alleges that "again NFCU

rejected the transaction due to insufficient funds and charged [her] *another* $29 NSF Fee," when

it returned another debit item (a second ACH debit).  *Id.*

**C.      ACH Debit Transactions**

Ms. Lambert does not and cannot allege facts plausibly suggesting the transactions

underlying her NSF fees were paper check transactions, as opposed to "ACH debit" transactions.

*See* Compl. ¶¶ 22-24, 32.  She nowhere alleges she did *not* authorize Mutual of Omaha to make

---

*10, n.10 (E.D. Va. 2015) (court may take judicial notice of newspaper articles on a motion to
dismiss), *amended on other grounds* 2015 WL 4254988 (E.D. Va. 2015).

[6] Ms. Lambert also attaches Navy Federal's Online Banking Application, but does not and
cannot allege facts plausibly suggesting those terms govern the transactions at issue in this case,
rather than the Important Disclosures, which govern ACH debit transactions initiated by third
parties (as discussed below).  Compl. ¶ 3 & Ex. C.

ACH debit requests against her Navy Federal account to pay her insurance premium, and she admits that "[a]n ACH debit might be made as a result of an authorization you gave a third party to automatically transfer funds from your account to pay your monthly insurance." *Id.* ¶¶ 24, 32.

ACH debit transactions are payment requests received by Navy Federal through an Automated Clearing House ("ACH") and governed by The National Automated Clearing House Association Operating Rules and Guidelines ("NACHA Rules"). *See id.* ¶¶ 6, 32 & Ex. A at 9 ("We can accept transfers to your checking or savings accounts and make transfers from your checking or savings accounts electronically. Such transfers are often received or sent in the form of ACH debits and credits.").[7] "There are five parties to an ACH transaction: (1) the Originator (here, the individual merchant with whom [Ms. Lambert] did business [Mutual of Omaha]); (2) the Originating Depository Financial Institution [("ODFI")] (the merchant's bank); (3) the ACH Operator (the Federal Reserve); (4) the Receiver [Ms. Lambert]; (5) the Receiving Depository Financial Institution [("RDFI")]" (Navy Federal). *Lossia*, 895 F.3d at 426; *see also Andrichyn*, 93 F. Supp. 3d at 380-81. "The Receiver [Ms. Lambert] is the party who authorizes the Originator [Mutual of Omaha] to introduce the transaction into the ACH Network." *Lossia*, 895 F.3d at 426. Once the Originator initiates the transaction, the Originator's "bank introduce[s] the transaction to the ACH Network by sending the transaction to the Federal Reserve (the ACH Operator), which in turn forward[s] the transaction[] to the Receiver's bank so that [the Receiver's] account [can] be debited." *Lossia*, 895 F.3d at 426-27. When an Originator initiates a debit transaction, "the consumer's bank [the RDFI] relies on a series of warranties received

---

[7] *See generally Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 426 (6th Cir. 2018) ("ACH transactions are electronic payments made from one bank account to another and involve one party providing their account number and routing number."); *Andrichyn v. TD Bank, N.A.*, 93 F. Supp. 3d 375, 380-81 (E.D. Pa. 2015) (describing ACH transactions and application of NACHA rules); *see generally* NACHA, https://www.nacha.org/rules/.

from the Originator through its bank that it has received proper authorization from the consumer before initiating a debit." *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 570-71 (E.D.N.Y. 2015) (internal citation omitted).[8]

Thus, for Mutual of Omaha to initiate any ACH debit from Ms. Lambert's account, as her allegations effectively concede occurred, *see* Compl. ¶ 24, Ms. Lambert must have authorized Mutual of Omaha to initiate a debit request to pay her monthly insurance premium. *See id.* ¶ 22. Under the NACHA Rules, the RDFI (here, Navy Federal) ***must*** "honor all debits presented" by Mutual of Omaha's bank, the ODFI. *Costoso*, 74 F. Supp. 3d at 571 (citing NACHA Rule 3.1.1; *Affinion Benefits Grp. LLC v. Econ-O-Check Corp.*, 784 F. Supp. 2d 855, 876 (M.D. Tenn. 2011)).[9] In these ways, the ACH debit system operates on an honor system similar to paper checks presented for payment, which a financial institution cannot verify but must still honor. Similarly, with ACH debit requests the RDFI (Navy Federal) must rely on the Originator's (Mutual of Omaha's) representation that the debits were authorized, and honor the debit request.

Where, as here, an RDFI returns a debit entry because the Receiver's account had insufficient funds to cover the debit, the Originator may "reinitiate" or "re-present" the entry "a maximum of two times in an attempt to collect funds."[10] Thus, the rules governing ACH

---

[8] *See also ACH Operations Bulletin #1-2014: Questionable ACH Debit Origination: Roles and Responsibilities of ODFIs and RDFIs*, NACHA (Sept. 30, 2014), *available at* https://www.nacha.org/news/ach-operations-bulletin-1-2014-questionable-ach-debit-origination-roles-and-responsibilities#_ftnref27 ("RDFIs rely on the representations of ODFIs made under the *NACHA Rules* that entries have been properly authorized."). The Court may consider NACHA's publicly available, *ACH Operations Bulletin #1-2014*, because it explains procedures "central to [Ms. Lambert's] claim"—the number of times an RDFI may process a reinitiated or represented ACH debit entry. *Stoney Glen*, 944 F. Supp. 2d at 464.

[9] *See ACH Operations Bulletin #1-2014*, *supra* note 8 (same).

[10] *ACH Operations Bulletin #1-2014*, *supra* note 8. That Ms. Lambert's counsel has filed seven similar lawsuits across the country against numerous financial institutions based on re-presented payment transactions underscores that re-presentment is a common and understood practice in the financial services industry. *Perks v. TD Bank, N.A.*, No. 1:18-CV-11176-DAB (S.D.N.Y.); *McNeil v. Capital One Bank, N.A.*, No. 1:19-cv-00473-FB-RER (E.D.N.Y.); *Valperga v. Bank of Am., N.A.*, No. 3:18-cv-06724-RS (N.D. Cal.); *Campbell v. Digital Fed. Credit Union*, No. 1:19-cv-10389-LTS (D. Mass.); *Jones v. United Commt'y Bank, Inc.*, No. 3:18-cv-00190-HSM-HBG

transactions expressly permit an authorized entity like Mutual of Omaha to reinitiate a payment request after an initial rejection for insufficient funds.

**D.      Ms. Lambert's ACH Debit Transactions and the Important Disclosures**

Ms. Lambert does not and cannot deny she provided her "account number and routing number" to Mutual of Omaha, thereby "authoriz[ing]" *Mutual of Omaha*, as the Originator, "to initiate the [first] ACH transaction." *Lossia*, 895 F.3d at 426-27. Indeed, as noted, Ms. Lambert admits: "An ACH debit might be made *as a result of an authorization [she] gave a third party to automatically transfer funds from your account to pay your monthly insurance premium*, utility bills, or car payment." Compl. ¶ 32 (quoting Compl., Ex. A at 9) (emphasis added).

Nor can Ms. Lambert allege facts plausibly suggesting that anyone other than Mutual of Omaha (the Originator) initiated the second ACH debit. *See* Compl. ¶¶ 22, 24. Indeed, the Important Disclosures on which she relies inform members such as Ms. Lambert that Navy Federal "***cannot*** cancel an agreement [a member has] with a third party or revoke the authorization that [the member has] provided a third party for recurring automatic transfers from [the member's] accounts." Compl., Ex. A at 11 (emphasis added). Rather, "[t]o cancel [her] agreement with [Mutual of Omaha] and revoke [her] authorization for recurring automatic transfers," Ms. Lambert had to "contact the third party [Mutual of Omaha] with whom [she had] an agreement." *Id.* Ms. Lambert does not allege she contacted Mutual of Omaha to ask it to cease re-presentment requests under her ACH agreement with it. Instead, she blames Navy Federal for the consequences of the actions *she* authorized Mutual of Omaha to take.

The Important Disclosures also required Ms. Lambert to contact Navy Federal if she believed an error had occurred with her account. *Id.* at 10. The Disclosures emphasize: "[i]f you

---

(E.D. Tenn.); *Howards v. Fifth Third Bank*, No. 1:18-cv-00869-MRB (C.D. Cal.); *Nelson v. ENT Credit Union*, No. 1:19-cv-00634-CMA-KMT (D. Colo.).

think your statement or receipt is wrong, or if you need more information about a transaction listed on your statement or receipt, contact us as soon as possible at the telephone numbers and address listed at the end of this agreement and disclosure." *Id.* Under the Disclosures, Ms. Lambert had "sixty (60) days after the FIRST statement on which the problem or error appeared" to notify Navy Federal if she believed an ACH debit attempt had occurred without her authorization. *Id.* at 10; *see also id.* at 11 (describing "procedures for resolving errors"). The Important Disclosures explain that if a member believes an error occurred on her account and timely reports the issue, Navy Federal will provide a provisional credit of the amount the member believes is in error pending investigation of the complaint so that the member does not lose use of the funds. *Id.* at 11. Ms. Lambert does not and cannot allege she contacted Navy Federal about the second NSF fee, or sought a provisional credit, waiver, or refund.

**E.     Ms. Lambert's Claims**

Rather than contact Navy Federal about her account, Ms. Lambert filed this putative class action on January 28, 2019. She claims Navy Federal wrongfully assessed the second NSF fee because, according to her, the Important Disclosures (which she calls the "Deposit Agreement") "indicat[e] that NSF Fees will only be assessed once per transaction or item—defined as a customer request for payment or transfer." Compl. ¶ 29; *see also id.* ¶¶ 8-9, 20, 30, 33, 42 (alleging the Important Disclosures "indicate that only a *single* NSF Fee will be charged per 'transaction' or 'item'" (emphasis in original)). She concludes that a re-presentment is a mere continuation of the first presentment, creating a "single" debit "item" or "transaction" even though a re-presentment is a ***separate request for payment*** by the Originator (Mutual of Omaha) to the RDFI (Navy Federal). *See* Compl. ¶¶ 24, 34, 38-39. And Ms. Lambert alleges the Disclosures "never disclose" that a second NSF fee may occur if a re-presentment (i.e., a second payment request) is returned for insufficient funds. *Id.* ¶¶ 7, 20; *see also id.* ¶¶ 28, 37, 40, 44.

7

Based on these allegations and legal conclusions, Ms. Lambert alleges claims for (a) breach of contract and the duty of good faith and fair dealing under Virginia law, on behalf of a putative class of "[a]ll NFCU checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item"; and (b) alleged violations of the North Carolina UDTPA, on behalf of a putative class of "[a]ll NFCU checking account holders in North Carolina who, during the applicable statute of limitations, were charged multiple NSF fees on the same item." Compl. ¶¶ 58, 70-85.

### III.   ARGUMENT

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint." *Repub. Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). The Court must "identify and reject legal conclusions unsupported by factual allegations," and "'formulaic recitation[s] of the elements' [of a claim] do not suffice." *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 464 (E.D. Va. 2013), *clarified on den. recon.* 2013 WL 4539736 (E.D. Va. 2013).[11]

---

[11] Another court in this district recently found in *Navy Fed. Credit Union v. LTD Fin. Servs., Inc.*, that it lacked diversity jurisdiction under 28 U.S.C. § 1332(a), concluding 28 U.S.C. § 1332(c) "applies only to state-chartered corporations," not federally-chartered credit unions. 2019 WL 1272531, *4-6 (E.D. Va. 2019). The court thus found Navy Federal stateless for diversity purposes, and not sufficiently "localized" in Virginia to trigger an exception. *Id.* at *9. Respectfully, Navy Federal disagrees and has appealed. *See* Case No. 1:18-cv-01424-AJT-TCB, Dkt. 172. It is undisputed Navy Federal is a "corporation," bringing it within the ambit of the principal place of business test in 28 U.S.C. § 1332(c), and Ms. Lambert admits Navy Federal's principal place of business is Virginia. Compl. ¶ 15. In addition, this case arises under CAFA jurisdiction, which requires only minimal diversity and which this case satisfies, as Ms. Lambert alleges she is a citizen of North Carolina, making her a "citizen of a State different from" Navy Federal. *See* 28 U.S.C. 1332(d)(2)(A).

**A. Federal Law Preempts Ms. Lambert's Claims Because She Seeks to Use Them to Regulate Navy Federal's Disclosures and Fees.**

Federal law preempts Ms. Lambert's claims because she seeks to use those state law claims to dictate Navy Federal's disclosures and fee practices, thereby interfering with its exercise of its powers as a federally-chartered credit union under the Federal Credit Union Act ("FCUA"), Truth in Savings Act ("TISA"), and their implementing regulations. *See, e.g.*, Compl. ¶¶ 7, 20, 28, 37, 40, 44, 50 (alleging Navy Federal failed to disclose it would assess multiple NSF fees and challenging its disclosures and fee practices); Compl., Prayer ¶ 1 (seeking a declaration that Navy Federal's "fee policies and practices" are "wrongful, unfair and unconscionable"); 12 C.F.R. §§ 701.35, 707.1.

Congress may preempt state law "either expressly through the statute or regulation's language or impliedly through its aim and structure." *Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193, *6 (E.D. Tex. 2017) (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)). In evaluating express preemption, the Court gives "[f]ederal regulations … no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Implied preemption exists when the state law "actually conflicts" with federal law, such as "where … the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes of the objectives of Congress." *Whittington*, 2017 WL 6988193, at *6 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)); *see also id.* at *6 (federal law preempts state law claims that "'prevent or significantly interfere' with [a federally-chartered] entity's exercise of its powers") (quoting *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007)); *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 722 (9th Cir. 2012).

In this way, federal preemption reaches beyond laws directly regulating federally-regulated conduct to facially neutral state statutes and claims (including those sounding in

contract), if the underlying claim challenges conduct falling within the preemptive scope of federal regulation. *See Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223 (4th Cir. 2002) (preemption "turns on whether the challenged conduct in the state claim would be covered under" the federal regime) (citing *Donmar Enters., Inc. v. S. Nat'l Bank of N.C.*, 64 F.3d 944 (4th Cir. 1995)); *see also Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th Cir. 2008) ("Regardless of the nature of the state law claim alleged … the proper inquiry is whether the legal *duty* that is the predicate of Plaintiffs' state law claim falls within the preemptive power of the [National Bank Act ("NBA")] or regulations promulgated thereunder.") (emphasis added); *Hawthorne v. Umpqua Bank*, 2013 WL 5781608, *12 (N.D. Cal. 2013) (dismissing good faith and fair dealing claim challenging bank's ordering of transactions because claim would "interfere[] with a national bank's federally authorized power to choose a posting order"); *Mann v. TD Bank, N.A.*, 2009 WL 3818128, *4 (D.N.J. 2009) (contract, implied covenant of good faith, unconscionability, and consumer protection claims premised on bank's gift card fees preempted). Parties cannot avoid federal preemption "by recasting otherwise preempted claims as state-law contract and tort claims." *Wilmington Shipping Co. v. New England Life Ins. Co.,* 496 F.3d 326, 341 (4th Cir. 2007) (*cited in In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 606 (D.S.C. 2015)).

Here, federal regulations promulgated by the National Credit Union Administration ("NCUA"), as authorized by Congress in the FCUA and TISA, expressly and impliedly preempt Ms. Lambert's claims. *See Donmar*, 64 F.3d at 949 (court looks to the relevant regulations "to determine the expressed pre-emptive intent" of the federal agency). Congress granted the NCUA authority to "prescribe rules and regulations for the administration of this chapter," 12 U.S.C. § 1766(a), and to promulgate TISA regulations providing for "clear and uniform disclosure of … the fees that are assessable against deposit accounts." 12 U.S.C. §§ 4311, 4301(b); *see also id.*

§ 4301(a).  Under these grants of authority, the NCUA promulgated regulations governing all facets of federal credit unions' lending and account servicing practices, including fee disclosures and assessment of fees on accounts (called "shares").  *See* 12 C.F.R. § 701 *et seq.* (regulations promulgated under FCUA); 12 C.F.R. § 707.1 *et seq.* (regulations promulgated under TISA).

In particular, the NCUA enacted 12 C.F.R. § 701.35, which regulates a federal credit union's account and dividend offerings, as well as the representations, terms and conditions, disclosures, and agreements about those account offerings.  12 C.F.R. § 701.35(a)-(b). Importantly, the regulation provides: "A Federal credit union may … determine the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account.  *State laws regulating such activities are not applicable to federal credit unions*." *Id.* § 701.35(c) (emphasis added).[12]  The NCUA intended this regulation to "expressly provide[] that [federal credit unions] are authorized to determine, *free from state regulation*, the types of disclosures [and] fees or charges" for their account offerings.  49 Fed. Reg. 46552-01 (1984) (emphasis added).

Similarly, under the authority granted by TISA, the NCUA promulgated 12 C.F.R. part 707, which requires federal credit unions to implement TISA disclosures, including disclosures regarding the "amount of any fee that may be imposed in connection with the account … and the conditions under which the fee may be imposed."  12 C.F.R. § 707.4(b)(4).  The NCUA again, however, made clear that its regulations—not state laws—govern:  "State law requirements that are inconsistent with the requirements of TISA and this part are preempted to the extent of the inconsistency."  12 C.F.R. § 707.1.  Thus, both the FCUA's and TISA's implementing

---

[12] The regulation calls for an expansive definition of "state law," including "judicial decisions of any state."  12 C.F.R. § 701.35(d).

regulations expressly preempt state laws to the extent those laws purport to regulate a federal credit union's disclosures and fee practices.

Indeed, that is precisely what the Eastern District of Texas held in *Whittington v. Mobiloil Federal Credit Union*, 2017 WL 6988193 (E.D. Tex. 2017). That case involved a challenge to the credit union's overdraft "fee assessment practices," which plaintiff claimed the credit union had "fail[ed] to disclose" and misrepresented. *Id.* at *8-9. Plaintiff there alleged, as does Ms. Lambert here, that the federal credit union was unlawfully charging multiple fees "for the same transaction." *Id.* at *9. The court dismissed under Rule 12(b)(6) the Texas consumer protection act and unjust enrichment claims as preempted under the FCUA, and the fraud claims as preempted under TISA, to the extent the plaintiff premised those claims on a failure to make disclosures, or on the types of fees the credit union charged or how it charged them. *Id.* at *7-11.

In finding the FCUA preempted the consumer protection and unjust enrichment claims, the court emphasized that under 12 C.F.R. § 701.35(c), "***any*** state laws that attempt to regulate a federal credit union's authority to determine 'the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account' are expressly preempted." *Id.* at *7 (emphasis added). The court found that to be the case because the plaintiff "attempts to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them. [Plaintiff] essentially asks the court to declare that the manner in which [Mobiloil] operates its overdraft program is unconscionable and unlawful." *Id.* at *9. Granting that request, the court found, "would amount to *de facto* regulation of the activities outlined in [12 C.F.R.] § 701.35(c)." *Id.* (plaintiff's claims would "significantly interfere with [the credit union's] authority to determine the types of fees or charges and other matters affecting" share accounts); *see also id.* at *8-9 (noting unjust

enrichment claim was based "on the same conduct" as the DTPA claim and preempted). The court also found TISA's implementing regulations, 12 C.F.R. § 701.1, preempted the fraud claims to the extent plaintiff sought "to use state law to force additional disclosures or require that disclosures be made in a particular manner." *Id.* at *10.

Numerous courts have reached similar conclusions when faced with state law consumer protection and common law claims, including those sounding in contract, where applying those laws to the challenged conduct would significantly interfere with a financial institution's exercise of federally delegated powers. *See, e.g.*, *id.* at *9-10 (collecting cases); *Rose*, 513 F.3d at 1038 (NBA preempted California consumer protection act claims challenging bank's failure to include certain disclosures on "convenience checks"); *Gutierrez*, 704 F.3d at 730 (NBA preempted California consumer protection act claims seeking "to dictate a national bank's order of posting"; "both the imposition of affirmative disclosure requirements and liability based on failure to disclose are preempted"); *In re TD Bank, N.A.*, 150 F. Supp. 3d at 609 (NBA preempted claims for good faith and fair dealing, unconscionability, unjust enrichment and state consumer protection statutes based on ordering of transactions because the claims sought to limit a bank's authorized powers; requested relief would result in a "de facto *complete prohibition*" on bank's authority to determine posting method (emphasis in original)).[13]

---

[13] The NCUA has issued numerous opinion letters also finding state laws seeking to regulate a federal credit union's fee practices preempted under 12 C.F.R. § 701.35(c). *See, e.g.*, *NCUA Opinion Letter 2007-0743*, Nat'l Credit Union Admin. at 1 (Aug. 7, 2007), *available at* https://www.ncua.gov/files/legal-opinions/OL2007-0743.pdf (Georgia law prohibiting federal credit unions from "charging a fee for cashing a check or a share draft drawn on it" preempted: "NCUA regulations implementing the Act's authority expressly permit FCUs to determine the fees, charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account and expressly states that '[s]tate laws regulating such activities are not applicable to federal credit unions.'"); *NCUA Opinion Letter 2006-1214*, Nat'l Credit Union Admin. at 1 (Apr. 1, 2007), *available at* https://www.ncua.gov/files/legal-opinions/OL2006-1214.pdf (Virginia statute limiting a credit union's ability to charge fees on inactive accounts preempted: "NCUA's longstanding position is that a state law, which attempts to govern an FCU's imposition of account fees and charges … directly conflicts with §107(6) of

13

As with the fraud claim in *Whittington*, Ms. Lambert's claims purport to require Navy Federal to make additional disclosures, and attempt to regulate the type of fees Navy Federal can charge and when it can do so (i.e., the method and manner of the fee practices). She repeatedly alleges that Navy Federal *failed to disclose* it would charge NSF fees for re-presented debit items—not that it affirmatively misrepresented its NSF fee practices. *See* Compl. ¶¶ 7 ("Account Documents *never disclose* that this counterintuitive and deceptive result could be possible …."); 20 ("[Navy Federal]'s Account Documents *never disclose* this practice."); 37 ("There is *zero indication* anywhere in the Account Documents …."); 40 ("The disclosures … *never discuss* a circumstance where [Navy Federal] may assess multiple NSF Fees …."); 44 ("*Nowhere does [Navy Federal] disclose* ….") (emphases added). Indeed, Ms. Lambert invokes disclosures from *other* financial institutions to argue those *different* fee disclosures would cure Navy Federal's alleged misconduct. *See, e.g.*, Compl. ¶¶ 47-48. But Ms. Lambert does not, for example, allege that Navy Federal assessed an NSF fee when she in fact had sufficient funds (a direct breach of contract claim). *Cf. In re TD Bank*, 150 F. Supp. 3d at 617 (contract claim not preempted where plaintiff alleged bank charged an overdraft fee despite sufficient funds in the account). Nor does Ms. Lambert allege Navy Federal made an affirmative misrepresentation.[14]

---

the Federal Credit Union Act (FCUA) and §701.35 of NCUA regulations and is preempted by federal law.); *NCUA Opinion Letter 2004-0259*, Nat'l Credit Union Admin. (Mar. 12, 2004), *available at* https://www.ncua.gov/files/legal-opinions/OL2004-0259.pdf (Federal Credit Union Act grants FCUs "exclusive authority" to impose fees, subject to regulation by the NCUA; "an FCU may impose fees and charges against a member account … without regard for state law"); *NCUA Opinion Letter 1998—0433*, Nat'l Credit Union Admin. at 2 (Sep. 14, 1998), *available at* https://www.ncua.gov/files/legal-opinions/OL1998-0433.pdf (finding "South Dakota disclosure law concerning fees on returned checks does not apply to credit unions" because federal law controls). Courts grant deference to such agency interpretations of the agency's own regulations. *D.L. ex rel K.L. v. Baltimore Bd. of Sch. Com'rs*, 706 F.3d 256, 259-60 (4th Cir. 2013).

[14] The Disclosures do not use the words "single" or "once," and do not define "item" or "transaction," contrary to Ms. Lambert's allegations otherwise. *See* Compl., Ex. A at 4. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached [to the complaint] … the exhibit prevails.")

Rather, she seeks to use state law claims to regulate (i.e., change) Navy Federal's disclosures and fee-assessment practices.

But that is exactly what federal law preempts. Under 12 C.F.R. § 707.1, any attempt by Ms. Lambert to use state law "to force additional disclosures or require that disclosures be made in a particular manner" is preempted. *Whittington*, 2017 WL 6988193, at *10; *see also Fultz v. World Savs. & Loan Ass'n*, 2008 WL 4131512, *1-2 (W.D. Wash. 2008) (NBA preempted consumer protection and common law claims seeking to "require particular disclosures at particular times and in a particular manner"). Any effort to use the UDTPA, breach of contract, or duty of good faith and fair dealing claims to require Navy Federal to change its NSF fee-assessment practices "would amount to *de facto* regulation of the activities outlined in [12 C.F.R.] § 701.35(c)," *Whittington*, 2017 WL 6988193, at *7, *9, which expressly authorizes federal credit unions to "determine the types of fees or charges" to assess, and which preempts "[s]tate laws regulating such activities," 12 C.F.R. § 701.35(c). Because Ms. Lambert seeks to use her state law claims to dictate Navy Federal's disclosures and fee practices, which 12 C.F.R. §§ 701.35(c) and 707.1 govern and preempt, the Court should dismiss her claims as preempted.

**B.      In any Event, Ms. Lambert's Breach of Contract and Duty of Good Faith and Fair Dealing Claims Fail as a Matter of Law.**

   **1.      Ms. Lambert's Agreement with Navy Federal Expressly Provides for the NSF Fees in this Case, Defeating any Contract Claim.**

Even if Ms. Lambert's contract claim were not preempted, it would still fail because her agreement with Navy Federal expressly allows for an NSF fee for "each returned debit item," and does not limit Navy Federal to a "single" NSF fee regardless the number of debit requests an Originator makes on behalf of a Receiver. Nor can Ms. Lambert allege facts plausibly suggesting that the second payment request in her case was not a "returned debit item,"

triggering an NSF fee under the plain terms of the Disclosures. The words of the Disclosures thus defeat Ms. Lambert's contract claim, requiring dismissal.

The starting point is the contract itself, which Virginia law governs. Compl. ¶ 74 & Ex. A at 7. "It is the function of the court to construe the contract made by the parties, *not* to make a contract for them." *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984) (court erred by "rul[ing] on what the parties might have agreed to instead of … on what they actually agreed to") (internal citation omitted; emphasis added). Courts construe a contract "as written, without adding terms that were not included by the parties." *Squire v. Virginia Hous. Dev. Auth.*, 287 Va. 507, 516, 758 S.E.2d 55, 60 (2014). The Court gives the words used their "usual, ordinary, and popular meaning," and presumes "the parties have not used words needlessly." *Id.* If "contractual language is unambiguous," the Court "simply give[s] the language its plain meaning." *Va. Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 654 (4th Cir. 2017) (applying Virginia law). "Contracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement," and whether a contract is unambiguous is a question of law. *Wilson*, 313 S.E.2d at 398.

The Important Disclosures provide, in relevant part: "Navy Federal may return debits to the checking account (e.g. an ACH debit) if the amount of the debit exceeds funds available in the checking account. A fee may be assessed … for each returned debit item." Compl., Ex. A at 4. This language is plain and informs members such as Ms. Lambert that "each" time Navy Federal "returns" a "debit" or "debit item" for insufficient funds, an NSF fee may be assessed, without regard to whether the debit is a re-presentment, *id.*—as occurred in Ms. Lambert's case, when Navy Federal received two separate debit requests and she had insufficient funds in her account each time. *See* Compl. ¶¶ 22-25. The common and ordinary definitions of "each

returned debit item," read in the context of the ACH debit system, confirms this plain interpretation of the Disclosures. *See Travelers Indem. Co. v. Portal Healthcare Sols., LLC*, 35 F. Supp. 3d 765, 770 (E.D. Va. 2014) (court may turn to dictionaries to "decipher[] a term's plain meaning"); *Erie Ins. Exch. v. EPC MD 15, LLC,* 822 S.E.2d 351, 356-357 (Va. 2019) (interpreting contract against "background principles" governing limited liability companies).

For instance, "the ordinary meaning of the word 'each' is 'every one of two or more considered individually or one by one." *Microstrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 432, 440-41 (E.D. Va. 2004), *aff'd* 429 F.3d 1344 (4th Cir. 2006); *see also Dickenson-Russell Coal Co., LLC v. Sec'y of Labor*, 747 F.3d 251, 258 (4th Cir. 2014) ("ordinary meaning" of "each" is "*every one* of two or more people or things considered separately") (citing Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/each) (emphasis in *Dickenson-Russell*). "Return" means "to pass back to an earlier possessor."[15]

The term "debit item" must be read in the context of the Disclosures as a whole, which consistently use "debit item" to mean an ACH debit transaction or presentment—i.e., an ACH debit request for payment. *See Erie Ins*., 822 S.E.2d at 356 (court must read contract as a whole). For instance, the Disclosures explain that: "An ACH debit might be made as a result of an authorization you gave a third party to automatically transfer funds from your account to pay your monthly insurance premium"—i.e., a debit made as a result of an authorization the member (Ms. Lambert) gave the merchant (the Originator, here, Mutual of Omaha) to request debits from the member's bank (the RDFI, here Navy Federal) to satisfy recurring payments (a monthly insurance premium). Compl. ¶ 32 (quoting Ex. A at 9). And the Disclosures explain that "Navy

---

[15] *See* https://www.merriam-webster.com/dictionary/return. "Return" also means "something returned: as (1) a paper calling for payment (as a check or draft) returned by a bank to the clearinghouse (as the London Bankers' Clearing House) because of lack of funds, insufficient endorsement, or other defect." Webster's 3d New Int'l Dict. 1941 (2002).

Federal posts *items presented* on your account [including] Automated Clearing House (ACH) debits." Compl., Ex. A at 3;[16] *see also id.* at 4 (Navy Federal may pay "ACH transactions presented against your checking account"); *id.* ("Navy Federal may return *debits* to the checking account (e.g. an ACH payment)"). Indeed, even Ms. Lambert agrees, as she must, that a "debit item" is an "instruction for payment." Compl. ¶¶ 34, 39.

Reading "each returned debit item" together, using their common and ordinary meanings and in the context of the Disclosures as a whole, shows that the Disclosures mean just what they say: every (each) ACH debit requested by an Originator for payment (debit item) that Navy Federal passes back to the ODFI for insufficient funds (returned) triggers an NSF fee. *See* Compl., Ex. A at 4, 9. Ms. Lambert does not and cannot allege facts plausibly suggesting that anything other than this exact scenario occurred in her case: Navy Federal assessed an NSF fee for each ACH debit requested (by Mutual of Omaha) and returned for insufficient funds.

Ms. Lambert attempts to argue otherwise by claiming she "only made one authorization for payment for her ACH transaction," and by unilaterally defining "transaction or item" as "a *customer* request for payment or transfer." Compl. ¶¶ 29, 41 (emphasis added). But she does not and cannot point to any language in the Disclosures defining "transaction or item" this way, and she admits the Disclosures define an "ACH debit" as including her pre-authorized debit requests via an Originator (Mutual of Omaha), as her allegations reveal occurred here. *Id.* ¶ 32 (quoting Ex. A at 9); *see also id.* ¶¶ 21-25. Nor do the Disclosures define "transaction" or "item" based on whether the member authorized each independent debit request. Quite the contrary, the Disclosures explain that if Ms. Lambert wants to avoid re-presentment of ACH debit requests

---

[16] *Cf.* Va. Code Ann. § 8.3A-501 ("'Presentment' means a demand made by or on behalf of a person entitled to enforce an instrument.'"); Webster's 3d New Int'l Dict. 1793 (2002) (defining "presentment" as "the act of producing and offering at the proper time and place a document (as a matured note, bill of exchange, or check) requiring to be accepted or paid by another").

(and the potential for multiple NSF fees), she must make that request to Mutual of Omaha, **_not_**

Navy Federal: "Navy Federal cannot cancel an agreement that you have with a third party or

revoke the authorization that you have provided a third party for recurring automatic transfers

from your accounts."  Compl., Ex. A at 11.  Ms. Lambert does not and cannot allege facts

plausibly suggesting she did not enter an agreement with Mutual of Omaha, under which she

authorized _it_ to make debit requests to Navy Federal—including re-presentments for debits

returned for insufficient funds—to make her monthly insurance payments.

Ms. Lambert's myopic focus on "item," "transaction," "ACH debit," and "A fee"

likewise cannot save her claims, for the Court must not read contract terms in isolation.  _See_

Compl. ¶¶ 28, 32, 33.  Rather, "in [the Court's] search for the plain meaning of 'any part of a

contract,' [it will] construe the contract as a whole, striving _not_ to 'place emphasis on isolated

terms' wrenched from the larger contractual context."  _Erie Ins._, 822 S.E.2d at 356 (citation

omitted; emphasis added).  "A fee" read in context simply means Navy Federal will assess "A

fee … for each returned debit item," as it did here.  Compl., Ex. A at 4.

Nor may the Court inject new words into the Disclosures, such as "single," "once," and

"one $29 NSF Fee … per … all iterations of the same instruction for payment." _Compare_

Compl. ¶¶ 8-9, 17, 20, 30, 33, 42.  "[C]ourts cannot read into contracts language which will add

to or take away from the meaning of the words already contained therein."  _Wilson_, 313 S.E.2d at

398.  Ms. Lambert's allegations show that this case does not involve the "same instruction for

payment," but rather two independent debit requests (or "instruction[s] for payment") on two

different days.  Compl. ¶¶ 21-25.

At bottom, Navy Federal's Important Disclosures explain that Navy Federal will assess

NSF fees for "each returned debit item," which includes ACH debit requests from a "third party"

(i.e., Originator) like Mutual of Omaha. Compl., Ex. A at 4. And the Disclosures nowhere say that Navy Federal will issue only a "single" or "one" NSF fee when an Originator represents a debit request for payment. Ms. Lambert's allegations show the Disclosures are unambiguous: she admits Navy Federal returned two separate ACH debit requests for insufficient funds on two separate days. Compl. ¶¶ 23-24. Ms. Lambert does not (and cannot) dispute that these were two separate debit requests, each of which Navy Federal returned, rendering each a "returned debit item." Navy Federal assessed an NSF Fee on "each returned debit item," as the plain terms of the Disclosures allowed. Thus, no breach of contract occurred and the Court should dismiss Ms. Lambert's contract claim.

### 2. Navy Federal Complied With the Duty of Good Faith and Fair Dealing.

The Court should also dismiss Ms. Lambert's duty of good faith and fair dealing claim because Navy Federal acted consistently with its rights under the Important Disclosures, and its decision to exercise those rights is not actionable.

### a. Navy Federal Acted Consistent With the Important Disclosures.

Under Virginia law, the duty of good faith and fair dealing "cannot be invoked to undercut a party's express contractual rights," nor does it "compel a party to take affirmative action not otherwise required under the contract" or "establish independent duties not otherwise agreed upon by the parties." *Monton v. Am. Servicing Co.*, 2012 WL 3596519, *7 (E.D. Va. 2012) (citing *De Vera v. Bank of Am., N.A.*, 2012 WL 2400627, *3 (E.D. Va. 2012)). The duty also cannot "rewrit[e] an unambiguous contract in order to create terms that do not otherwise exist." *McInnis v. BAC Home Loan Servicing, LP*, 2012 WL 383590, *8 (E.D. Va. 2012). As a result, "a party does not violate the obligation to act in good faith by 'enforcing a contractual right.'" *Albayero v. Wells Fargo Bank, N.A.*, 2011 WL 4748341, *6 (E.D. Va. 2011).

In arguing that Navy Federal "exercises its discretion" under the Important Disclosures to issue NSF fees "for each returned debit item," Ms. Lambert tacitly admits that Navy Federal has the right to assess such fees under the Disclosures. Compl. ¶ 52; *see also id.* ¶¶ 51, 53, 55. Navy Federal's choice to exercise its right under the Disclosures cannot, however, constitute a breach of the duty of good faith and fair dealing, unless Ms. Lambert also alleges facts plausibly suggesting Navy Federal acted *dishonestly*, i.e. affirmatively lied to Ms. Lambert. *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 466–69 (E.D. Va. 2013) ("[W]here a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly"), *clarified on den. recon.* 2013 WL 4539736 (E.D. Va. 2013)

Ms. Lambert alleges no such facts. At most, she complains Navy Federal "exercise[d] its contractual discretion in bad faith," Compl. ¶ 76, but that amounts to a bare legal conclusion and "formulaic recitation of the elements of a cause of action," which does not suffice under Rule 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Even if that were otherwise (and it is not), an allegedly arbitrary exercise of a contractual right does not equal dishonesty, and does not breach the duty of good faith. *Charles E. Brauer Co. v. Nations Bank of Va., N.A.*, 251 Va. 28, 35, 466 S.E.2d 382, 386 (1996) (exercising contractual rights is not a breach of the duty of good faith and fair dealing, even where the challenged conduct was arbitrary); *see also De Vera*, 2012 WL 2400627, at *3 (dismissing duty of good faith and fair dealing claims; "where parties to a contract create valid and binding rights, the implied covenant of good faith and fair dealing is inapplicable to those rights"). Indeed, another Court rejected the same argument by Ms. Lambert's counsel, dismissing a breach of good faith claim, finding it "strains credulity" that

the financial institution breached the duty "by processing debits authorized by the Plaintiffs" via a third-party ACH agreement. *Andrychin*, 93 F. Supp. 3d at 387.[17]

### b. Navy Federal Exercised Accrued Contractual Rights.

Ms. Lambert cannot salvage her good faith and fair dealing claim by asserting, as she does, that Navy Federal's fee-assessment practices constitute an unfair use of "discretion" because Navy Federal "may" assess an NSF fee on each returned debit item. *See* Compl. ¶¶ 76; 53 ("[Navy Federal] maintains complete discretion not to assess NSF Fees … [because] 'a fee may be assessed'").[18]

Navy Federal's decision to exercise a right it "may" exercise under the Disclosures is not an act of contractual "discretion"; rather, it is the exercise of an *accrued right*. Parties to a contract can *always* waive an accrued right or forbear from enforcing it. If that choice constituted actionable "discretion," every choice to exercise a contractual right (instead of to waive or forbear it) would give rise to a breach of the duty of good faith and fair dealing. Precisely to avoid this result, Virginia courts "explicitly reject[] attempts to characterize the decision whether to exercise an accrued right as a matter of 'contractual discretion.'" *Stoney Glen*, 944 F. Supp. 2d at 466-69; *see also Land & Marine Remediation, Inc. v. BASF Corp.*,

---

[17] Navy Federal's conduct is consistent not only with the Important Disclosures, but also, as Ms. Lambert implicitly acknowledges, with industry practice. *See* Compl. ¶¶ 47-49 (cataloguing financial institutions implementing NSF fees similarly to Navy Federal); *see also supra* note 10 (listing cases Ms. Lambert's counsel has filed across the country based on the same theories).

[18] As the Important Disclosures explain, Navy Federal has *no* discretion to unilaterally refuse ACH debit requests presented by an Originator, such as Mutual of Omaha. Compl., Ex. A at 11 (describing stop payment procedures). Rather, the member (Ms. Lambert) "must contact the third party with whom you have an agreement" to "cancel your agreement with [the] third party and revoke your authorization for recurring automatic transfers." *Id.*; *see also Your top five questions about checking accounts answered*, Consumer Finance Protection Bureau (Mar. 25, 2019), *available at* https://www.consumerfinance.gov/about-us/blog/your-checking-accounts-questions-answered/ ("How do I stop automatic debit payments from my account?....Call and email or write the company taking the payments out to let them know that you want to stop future payments …."). Ms. Lambert does not allege she attempted to contact Mutual of Omaha to stop payment after the first ACH debit was returned for insufficient funds. Compl. ¶¶ 21-25.

2012 WL 2415552, *1-2 (E.D. Va. 2012) ("[I]f exercising an express contractual right to demand payment…were permitted to be recast as a 'discretionary' decision merely because the non-breaching party could opt *not* to exercise such express right, *every* contractual right would be subject to being recast as 'discretionary.'" (emphasis in original)); *In re Buffalo Coal Co.,* 2010 WL 724702, *4 (Bankr. N.D.W.V. 2010) ("[A] finding that every decision to exercise a contractual right is imbued with an act of discretion that must be exercised in good faith would wholly eviscerate the [principle] that a party cannot act in bad faith by acting pursuant to an express contractual right.").

Examples of true contractual discretion include agreements granting one party the "sole discretion" to perform under the agreement at all, or the discretion to determine, subjectively, whether a contractual right has accrued. *See, e.g. Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541-42 (4th Cir. 1998) (agreement that granted one party the "sole discretion to decide whether to mine the land" at all required exercise of good faith); *Stoney Glen*, 944 F. Supp. 2d at 468-69 (agreement granting one party the right to decide what constituted a "material misrepresentation or omission required good faith). In contrast, the exercise of an accrued right is never "discretionary" when the right accrues based on "the occurrence of an objective, undisputed fact." *Stoney Glen*, 944 F. Supp. 2d at 469.

Here, the fact Navy Federal "may" assess an NSF fee "for each returned debit item" does not transform its decision to do so into an exercise of "contractual discretion," because the contractual right accrues based on "the occurrence of an objective, undisputed fact"—a debit item returned for insufficient funds. That Navy Federal has the discretion to waive an NSF fee if a member subsequently challenges it does not make the exercise of the initial, accrued contractual right unlawful. Ms. Lambert does not and cannot deny that Navy Federal returned

two debit items because her account lacked sufficient funds to satisfy two debit requests on two different days.  *See* Compl. ¶¶ 21-25.  Under the Disclosures, Navy Federal decides only whether to exercise an accrued right upon the occurrence of objective facts.  That renders the duty of good faith and fair dealing inapplicable.  *See, e.g.*, *Monton*, 2012 WL 3596519, at *7 (dismissing duty of good faith and fair dealing claim under Rule 12(b)(6) because defendant had "the right to accelerate payment of the loan and ultimately foreclose on the property" on plaintiff's failure to make loan payments).[19]

## C.    Even if Not Preempted, Ms. Lambert's UDTPA Claim Fails.

The Court should dismiss Ms. Lambert's North Carolina UDTPA claim for three independently sufficient reasons:  (a) the parties selected Virginia law to govern their relationship, barring application of North Carolina statutory law; (b) Navy Federal did not act unfairly or deceptively by adhering to the Important Disclosures; and (c) even if Ms. Lambert had adequately alleged a breach of a contract (which she has not), simple contract breaches do not state a claim under North Carolina's UDTPA as a matter of law.

### 1.    Virginia Law Applies, Barring Application of North Carolina Law.

In determining which state's law applies in diversity actions such as this one, this Court applies the choice of law rules of Virginia.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Here, Ms. Lambert and Navy Federal selected Virginia law as the governing choice of law:  "Navy Federal accounts are maintained and governed in accordance with federal law and the laws of the Commonwealth of Virginia …."  Compl., Ex. A at 7.  Ms. Lambert

---

[19] It makes no difference whether the Important Disclosures are an adhesion contract, *see* Compl. ¶ 51, for "Virginia adheres to the general rule that: 'The use of a standard form contract between two parties of admittedly unequal bargaining power does not invalidate an otherwise valid contractual provision.'"  *Saturn Distr. Corp. v. Williams*, 905 F.2d 719, 726 (4th Cir. 1990); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346-47 (2011) ("[T]he times in which consumer contracts were anything other than adhesive are long past.").

agrees, alleging Virginia law governs her relationship with Navy Federal. Compl. ¶ 74 ("Under Virginia law, made applicable to all accountholders in the Deposit Agreement ….").

"Under Virginia law, contractual choice-of-law provisions," such as the parties' provision here, "are dispositive on the question of what substantive law applies to a given cause of action." *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 806 n.5 (E.D. Va. 2017). "'Where a choice-of-law clause in the contract is sufficiently broad to encompass contract-related tort claims,' Virginia courts will 'honor[ ] the intent of the parties to choose the applicable law' and apply the provision to related, non-contract claims." *Zaklit v. Glob. Linguist Sols., LLC*, 2014 WL 3109804, *9 (E.D. Va. 2014) (quoting *Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614, 628 (4th Cir. 1999)). "The rationale underlying this rule is straight forward; allowing parties to negotiate the rules that govern their relationship creates certainty and avoids applying the laws of multiple jurisdictions to a controversy having its origin in a single, contract-based relationship." *Zaklit*, 2014 WL 3109804, at *9.

The parties' broad choice of law provision here encompasses contract-related tort claims. *See Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 678 n.3 (E.D. Va. 2012) ("[U]nder Virginia law, choice of law clauses generally encompass contract-related tort claims."). In particular, the Important Disclosures provide accounts are "***maintained and governed***" in accordance with Virginia law. Compl., Ex. A at 7 (emphasis added). This Court has held the phrase "'governed by' in a choice of law provision 'is a broad one signifying a relationship of *absolute direction, control, and restraint*,' which 'reflects the parties clear contemplation that 'the agreement' is to be *completely and absolutely controlled by*' *the chosen law*." *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 466-68 (E.D. Va. 2016) (applying Virginia law to contract-related tort claims where clause stated agreement shall be

"governed by and construed in accordance with" Virginia law) (emphasis added); *see also Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 653-54 (E.D. Va. 2004) (applying Virginia law to contract-related tort claims where provision stated "the laws of the Commonwealth of Virginia, excluding the conflicts-of-law rules, govern this Agreement and your membership").

As in *Run Them Sweet* and *Freedman*, the Court should apply the choice of law provision in the Important Disclosures to Ms. Lambert's contract *and* UDTPA claims, which both arise from the Disclosures. Indeed, Ms. Lambert bases her UDTPA claims on the *same allegations* as those underlying her breach of contract claim. *Compare* Compl. ¶ 73 ("[Navy Federal] breached the terms of its contract with consumers by charging multiple NSF fees on the same transaction."), *with* Compl. ¶ 82 ("[C]harging multiple NSF fees on a single transaction is both unfair and deceptive …."). And she seeks to use her UDTPA claim to challenge how and when Navy Federal can assess fees "for each returned debit item"—a practice governed by the parties' contract. *See* Compl. ¶¶ 64.D, 80-82 (asserting UDTPA claim based on Navy Federal's "assessment of NSF Fees," "imposition of NSF Fees," and practice of "charging multiple NSF Fees"); Compl., Ex. A at 4 ("A fee may be assessed … for each returned debit item.").

Because Ms. Lambert bases her UDTPA claim on her breach of contract allegations and theories, and because she asserts the claim to challenge Navy Federal's conduct under the Important Disclosures, the claim is a contract-related tort claim that falls within the parties' broad Virginia choice of law provision. *See, e.g.*, *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) ("[R]ecognizing the close relationship of the tort claims to the contract, this Court will apply Virginia law to Hitachi's fraud claims."); *Run them Sweet*, 224 F. Supp. 3d at 467-68 (applying Virginia law where "plaintiff's California tort and unjust enrichment claims are based on precisely the same facts as those on which the breach-of-contract

claim is based."); *Freedman* 325 F. Supp. 2d at 653-54 (applying Virginia law where "plaintiff's [Connecticut] UTPA claim effectively puts this provision of the Agreement at issue").

As courts in Virginia have repeatedly held, this means Ms. Lambert cannot assert a North Carolina UDTPA claim against Navy Federal, as a matter of law. *See, e.g.*, *Freedman*, 325 F. Supp. 2d. at 653-54 (dismissing Connecticut UTPA claim when contract selected Virginia law and statutory claim put the parties' contract at issue); *Run Them Sweet*, 224 F. Supp. 3d at 464, 468 (enforcing Virginia choice of law provision and dismissing California unfair practices act claim because the claim "clearly challenge[d] the Agreement's conditions, particularly its fee structure"). This result makes sense, for "[t]o layer the tort law of one state on the contract law of another state compounds … complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote." *Pyott–Boone Elecs. Inc. v. IRR Trust for Donald L. Fetterolf Dated Dec. 9, 1997*, 918 F. Supp. 2d 532, 544 (E.D. Va. 2013) (citation omitted). Navy Federal bargained for application of Virginia law to achieve commercial certainty with its members across the country; the Court should not upset that certainty by applying North Carolina law to Ms. Lambert's contract-based UDTPA claim.[20]

## 2. Navy Federal Did Not Act Unfairly or Deceptively When It Complied with the Disclosures.

Even if the Court were to reach Ms. Lambert's North Carolina UDTPA claim, it should still dismiss the claim because Navy Federal followed the words of the Disclosures and thus, did not act unfairly or deceptively. "Although it may seem obvious, a party's actions that conform

---

[20] Ms. Lambert's alleged residence in North Carolina is the *only* reason she brings this claim, Compl. ¶ 10, and if Ms. Lambert can avoid the choice of law provision and bring claims based on the law of her domicile, each of Navy Federal's members could seek to hold Navy Federal liable under the laws of their chosen domicile, leading to disparate interpretations and applications of the same terms—something even Ms. Lambert admits she cannot do. *See* Compl. ¶ 74 (admitting Virginia law applies to contract claims). That is precisely the type of complexity "sound commercial law should not seek to promote." *Pyott–Boone,* 918 F. Supp. 2d at 544.

with the terms of a contract have not been considered an unfair trade practice." *Gay v. Peoples Bank*, 2015 WL 3650090, *11 (N.C. Super. 2015), *aff'd*, 247 N.C. App. 397, 786 S.E.2d 433 (2016) (quoting Noel L. Allen, 1 *N. Car. Unfair Bus. Prac.* § 19.04[2][b] (Matthew Bender 2014)). North Carolina courts thus refuse to permit UDTPA claims where a defendant acted in a manner consistent with the parties' agreement. *See, e.g.*, *Gaynoe v. First Union Corp.,* 153 N.C. App. 750, 755, 571 S.E.2d 24, 27 (2002) ("Since we have concluded that defendants acted in accordance with the cardholder agreement … the record does not establish independent grounds for an unfair or deceptive trade practices claim ….").

As discussed, the Important Disclosures here specifically informed Ms. Lambert that Navy Federal could assess "A fee … for each returned debit item." Compl., Ex. A at 4. It is undisputed that Navy Federal assessed an NSF fee "for each returned debit item" in Ms. Lambert's case: one returned debit item on October 16, 2018, and one returned debit item on October 18, 2018. Compl. ¶¶ 21-25. Because the parties' agreement expressly allowed that conduct, Navy Federal's actions were neither unfair nor deceptive, and Ms. Lambert's UDTPA claim based on that conduct fails. *Gaynoe*, 571 S.E.2d at 27; *Perry v. Meredith Corp.,* 77 Fed. App'x 128, 131 (4th Cir. 2003) (affirming dismissal of UDTPA claim where plaintiff failed to allege defendants acted "inconsistent with … the express terms" of the parties' contract).

### 3. Ms. Lambert's UDTPA Claim Fails Because She Bases It on a Breach of Contract Theory, Which Cannot Suffice to State a Claim.

Ms. Lambert's UDTPA claim fails for yet an additional independent and sufficient reason: she bases the claim on nothing more than an alleged breach of contract, which does not suffice to state a claim, as a matter of law. As the Fourth Circuit observed:

> It has been said that because '[p]roof of unfair or deceptive trade practices entitles a plaintiff to treble damages,' a [UDTPA] count 'constitutes a boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina.' To correct

> this tendency, and to keep control of the extraordinary damages
> authorized by the [UDTPA], North Carolina courts have repeatedly
> held that "a mere breach of contract, even if intentional, is not
> sufficiently unfair or deceptive to sustain an action under [the
> UDTPA,] N.C.G.S. § 75–1.1."

*Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (internal

citation omitted). Thus, to state a UDTPA claim arising out of a breach of contract, a plaintiff

must establish "*substantial aggravating circumstances* attendant to the [breach of contract.]"

*Gray v. N.C. Ins. Underwriting Assocs.*, 352 N.C. 61, 75, 529 S.E.2d 676, 685 (2000) (emphasis

added). These allegations must be "*distinct* from the allegations regarding a breach of contract,

and [must] *not* [be] based on the existence of an agreement, the terms contained in the

agreement, and the interpretation of the agreement." *Carolina Rest. Grp., Inc. v. PepsiCo Sales,

Inc.*, 2015 WL 4250395, *6 (W.D.N.C. 2015) (citations and quotation marks omitted; emphasis

added). Aggravating circumstances "typically involve forged documents, lies, and fraudulent

inducements." *Davis v. State Farm Life Ins. Co.*, 163 F. Supp. 3d 299, 307 (E.D.N.C. 2016).

Ms. Lambert alleges no such facts—no forged documents, lies, or fraudulent

inducements. Quite the opposite, Ms. Lambert states allegations *identical* to those underlying

her breach of contract claim. *Compare* Compl. ¶ 73 (contract claim alleging "[Navy Federal]

breached the terms of its contract with consumers by charging multiple NSF fees on the same

transaction.") & ¶ 72 (contract claim challenging alleged practice of "charg[ing] multiple NSF

Fees on a single transaction"), *with* Compl. ¶ 82 (UDPTA claim challenging alleged practice of

"charging multiple NSF fees on a single transaction is both unfair and deceptive…."). Ms.

Lambert does not allege *any* facts showing distinct elements or aggravating circumstances for the

UDTPA claim. Instead, she simply alleges—as in her breach of contract claim—that Navy

Federal charges multiple NSF fees and does not properly disclose that practice. *See, e.g.*, Compl.

¶¶ 71-73, 80-82. Courts in North Carolina regularly dismiss UDTPA claims that allege nothing

more than a breach of a contract, and this Court should do so here. *See, e.g. Broussard*, 155 F.3d at 347 ("Given the contractual center of this dispute, plaintiffs' UTPA claims are out of place."); *Gray*, 529 S.E.2d at 685 ("[T]he trial court could not have properly concluded that the breach of contract itself constituted a violation of N.C.G.S. § 75–1.1.").

## IV.    CONCLUSION

For the reasons stated above, the Court should dismiss with prejudice Ms. Lambert's Complaint for failure to state a claim.

Dated:  April 1, 2019.            Respectfully submitted,

By  s/ D. Bradford Hardin, Jr.
D. Bradford Hardin, Jr., VSB #76812
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave. NW, Ste. 800
Washington, DC  20006
Telephone: (202) 973-4238
Facsimile: (503) 973-4438
bradfordhardin@dwt.com

Frederick B. Burnside, *Admitted Pro Hac Vice*
Rebecca J. Francis, *Admitted Pro Hac Vice*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Ste. 3300
Seattle, WA  98104
Telephone: (2067) 622-3150
fredburnside@dwt.com
rebeccafrancis@dwt.com

*Counsel for Navy Federal Credit Union*