

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION
703 299 2104

Civil Action No. 1:19-cv-00103-LO-MSN

| | | |
|---|---|---|
| **Ruby Lambert,** Individually and on Behalf of others similarly situated | ) | |
| | ) | |
| Plaintiffs | ) | Ronald W Erickson |
| v | ) | *Objections to Settlement Letter* |
| **Navy Federal Credit Union** | ) | |
| Defendant. | ) | |
| | ) | Clerk Action Required: file |

*Man with fiddle case*
*Asks county recording clerk*
*For a microphone.*

## I.   IDENTITY OF CLASS ACTION PLAINTIFF

I Ronald Westely Erickson was born in Spokane, Washington Nov. 5, 1949, age 71, and now live in Clallam County Washington on the Olympic Peninsula at 934 W. Lauridsen Blvd. Apt. #209, Port Angeles, WA 98363-7478. I have one phone, a cellphone number (360) 809-1755. Since 1997 I receive SSDI and now SS of 921 dollars per month supplemented with incidental self-employment under 100 dollars a month.

I have a credit card debt of about 28,000 dollars.

I require extra time to draft legal papers due to a rambling, distractible, short-term memory challenges resulting from an ADA disability recognized by the court system. *See App. J* (Washington State Superior Court Order). Legal reading and writing are both difficult and often unhealthy for me emotionally triggering anxiety, racing thoughts, obsessiveness, arrogance, and frustration focusing and organizing. Writing is often disconnected. By God's Grace I manage. Please excuse my organizational misplacements and repetitions as I attempt to represent "analogously similar" NFCU member-owners who received a Legal Notice in this class action lawsuit. I have an unusual perspective, read slow, miss connections, and do not claim to adequately understand nor present well legal arguments. I am told it takes me much longer than normal people to do some things. And, I have difficulty answering questions directly. This paper took me over 140 hours, more editing than reading.

*Small legal notice,*
*Print on paper quivering,*
*Optical migraine!*

1

## II.    BASIS FOR SETTLEMENT CLASS MEMBERSHIP
### A.  AS A CLASS A SETTLEMENT MEMBER

In late January 2021, around the 24th I received an undated legal notice postcard addressed to me from the JND Legal Administration office in Seattle, Washington regarding the *Lambert Representment NSF Fee Settlement* funds. *See Att. A.*

JND's postcard declared in capitalized words that, "If You were charged representment NSF fees by Navy Federal Credit Union Between 2014 and 2020, You Could Get Benefits From a Class Action Settlement."

Lambert's *Complaint's* national class action class was defined on JND's website as:

> All NFCU checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item (the "Class").                                                    *See C. para. 58.*

JND's Legal Notice's wording is clearer, than JND's website using the undefined term "statute of limitations." Both differed from the Settlement's Class definition,

> 44. "Settlement Class" means all current and former Navy Federal members in the United States who were charged Representment NSF Fees during the Class Period.
> *See S. para. 44.*

Confusing. Whereas the Settlement permitted an opt-out procedure, *S. para. 59*, and the right to object, *S. para. 60*, and because I did not opt-out I am permitted to Object to Settlement.

On April 14, 2015, sponsored by my big brother, Lt. Colonel Steven Carl Erickson USMC (now deceased). I opened my *savings, checking* and *credit card* accounts with Navy Federal Credit Union [hereafter NFCU] and maintained an "active membership" status since then and throughout the remainder of this class action's qualifying months.

On June 29, 2015, I opened a *checking line of credit* account to manage NSF fees on my checking account checks. I believe at that time I had a NSF fee at some banking institution that prompted me to provide NSF protection for all three of my banking accounts.

On March 10, 2016, my NFCU checking account was compromised and closed/ replaced with a new checking account number with a new *checking line of credit* account. Since that time I had financial difficulties and believe I exceeded my *checking line of credit* limit with a paper check rent payment and an authorized ACH debit to my landlord for the same month. I forgot.

On Feb. 6, 2021, the attorney for NFCU, Fred Burnside, in an email asserted,

> "you are currently represented by class counsel, subject to your opt out rights. I am not permitted to have direct contact with a [sic.] represented parties. . . ." *See App. B*

2

The JND Legal Administration website, www.lambertnsffeelitigation.com, specifically says in answering their question #15 *How do I tell the Court that I don't like the Settlement?*

> If you are a Settlement Class Member and have not requested to be excluded from the Settlement Class, you can object to any part of the Settlement, the Settlement as a whole, Class Counsel's requests for fees and expenses and/or Class Counsel's request for a Service Award for the Plaintiff.

As a "Settlement Class member", S. para. 46, I chose to NOT opt-out, S. para. 59; and thus became a Settlement Class Member, S. para. 45, and am qualified to object, *S. para. 60.*

The JND Administrator has not yet affirmed or denied that I am entitled to a Settlement, being sent a NVY D32AC655W4 LEGAL NOTICE. Regardless, as a recipient of JND's Legal Notice I need not present additional evidence of being included in the class action, *Rozema v The Marshfield Clinic,* 174 F.R.D. 425, 444 (W.D. Wis. 1977):

> Those representatives in a class action are passive member and need not make individual showings of standing.

This *Opposition to Settlement* was properly sent to the court clerk for recording.

> *One judge looks and finds*
> *Separation of powers,*
> *Legislated law!*

### III.    GROUNDS FOR OBJECTION & OBJECTIONS
### A. GROUNDS

This *Objection to Settlement* conforms to the Settlement's requirements, S. para. 61.

FRCP 8(a)(2) "a short and plain statement of the claim showing that the pleader is entitled to relief."

FRCP Rule 23

The Settlement, *S. para. 95 (b, c, d),* recognizes that this Court may modify and dismiss this Settlement in part or in its entirety. *S. para.123(c):*

> Invalidation of any portion of this Settlement shall invalidate this Settlement in its entirety unless the Parties agree in writing that the remaining provisions shall remain in full force and effect. *S. para.123 (c).*

The evolving legal environment of the courts is authority also for this Court to steer away from casting and catching blame and analyzing cases and Settlement proposals on a governmental interest analysis, most significant analysis, and better rule of law. *See* Simson, Gary J., *The Choice of Law Revolution in the United States: Notes on Rereading Von Mehren,* 36 CORNELL INT'L L.J. 125, 125 (2003):

The traditional methodology of place of wrong . . . has receded in importance, and new approaches such as governmental interest analysis, most significant interest analysis, and better rule of law have taken center stage' (footnotes omitted)"] cited in *Sosa v Alvarez-Machain*, 124 S. Ct. 2739, 2752 (2004) saying, "It is true that the traditional approach to choice of substantive tort law has lost favor" when commenting regarding the application of governmental contractor defense being applied when a substantive domestic law conflicts with any conflict of law rule – in this case to collect damages for use of herbicides in the Viet Nam War.

*See In re "Agent Orange" Prod. Liab. Litig.*
373 F. Supp. 2d 7, 9, MDL No. 381, No. 04-CV-400, p. 9 (E.D.N.Y. March 8, 2005).

*Legal class action.*
*Attorneys with briefs and suits,*
*Home with no power.*

## B. OBJECTIONS
### B1. INTRODUCTION & SUMMARY

Lambert requested in her *Complaint's* Prayer for Relief that a jury trial be held on all claims including, "Declaring NFCU's NSF Fee policies and practices to be wrongful, unfair and unconscionable; *C. p. 17.* Any other relief that would follow such a finding lacks relevance given the special conditions for membership in NFCU's Important Disclosures as a member-owner in NFCU's non-profit credit union.[1]

Thomas Jefferson once said that the purpose of a jury was to guarantee common sense in the legal process. Ms. Lambert request for juries is an invitation to bring common sense to both this litigation and Settlement. [hereafter Settlement].

Consequently, I ask this court to consider the disbursement of Residue Funds not as suggested but to NFCU as a special ADA Load Fund to assist NFCU needy disabled as NFCU exclusively benefits U.S. military personnel and their families.

This case and Settlement actually turns on whether Ms. Lambert agreed to accept NFCU's inadequately clarified disclosures or not. Ms. Lambert seemingly did agree, without her knowledge of doing so, by becoming a NFCU member-owner that accepted NFCU's fluctuating practices, *See ID p. 1.*

Ms. Lambert's Counsel admits any similarity of the Membership class is based on NFCU's agreements, so NFCU's waivers are common to all NFCU member-owner "customers":

---

[1]: "What is the difference between a bank and a federal credit union?" Williams, Geoff, *The Pros and Cons of a Credit Union Verses a Bank.* www. U.S. News Money March 15, 2019. www.money.usnews.com. Accessed Feb. 5, 2020. ["The main difference between a bank and a credit union is that a bank is a for-profit financial institution, while a credit union is a nonprofit. . . ."].

64. . . . For example, each Settlement Class member's relationship with Navy Federal arises from an agreement that is the same or substantially similar in all relevant respects to other Settlement Class members' agreements. *PMISOF para. 64.*

Such implies Counsel values the importance and relevance of NFCU's Important Disclosure p. 1 waiver of member-owner's right to protest undisclosed policies.

According to four Supreme Court Justices of Washington State in an open forum in my town, Port Angeles, they all asserted that citizens of the United States may waive any of their rights, as they knew of no inalienable rights. Lambert did so waive her right to be fully informed at all times of NFCU policies and procedures prior to NFCU implementing such.

In The Commonwealth of Virginia case law supports contracts being exercised in good faith according to the contract terms:

> Va. Vermiculite, 156 F.3d at 542 ("[I]t is a basic principle of contract law in Virginia, as elsewhere, that... the duty of good faith does not prevent a party from exercising its explicit contractual rights...." (emphasis in original)); Riggs Nat 7 Bank of Wash., D.C. v. Linch, 36 F.3d 370,373 (4th Cir. 1994) ("An implied duty of good faith cannot be used to override or modify explicit contractual terms."); Wilkins v. United States, 2016 WL 2689042, at *4 (E.D. Va. May 9,2016) (dismissing implied covenant claim where the defendant "had the contractual right... to engage in the actions alleged in the Complaint"); . . . Albayero v. Wells Fargo Bank, N.A., 2011 WL 4748341, at *6 (E.D. Va. Oct. 5,2011) (dismissing implied covenant claim where "the actions taken by Defendants merely amounted to an exercise of their contractual rights").                        *See OM2D p. 11.*

NFCU's member-owner waiver must be respected by this court, and the Settlement dismissed or the case dismissed by this Court's own prerogative.

It must be noted that Virginia is not a pro-class action state like California who has legislated into the courts a policy to negate an individual's rights to waive their contract benefits.

> In Lloyd v. Navy Federal Credit Union, the United States District Court for the Southern District of California found the Virginia choice-of-law provision at issue unenforceable as to the plaintiffs California consumer protection statutory claims because enforcing the provision would violate California's public policy. 2018 WL 1757609, at *5-6 (S.D. Cal. Apr. 12, 2018). The holding in Lloyd was based on (a) California's fundamental public policy in favor of class actions, which the California statutes permit **but the Virginia statutes do not** [Emphasis added], and (b) the express anti-waiver provision in one of the California consumer protection statutes at issue, which stated that waivers are unenforceable as contrary to public policy. Id. at *5.[Emphasis added]. [FN #3] Liam O'Grady v United States District Judge waive[d] provision or any statement that the ability to bring suits against a credit union is a fundamental policy of the state, Lloyd does not apply to this case. *OM2D p. 12.*

Regardless, this Settlement specifically puts all Class Members under Californian law argued in the anti-pro-class-action Commonwealth of Virginia:

5

> With respect to all Released Claims, Plaintiff and each of the other Settlement Class Members agree that they are expressly waiving and relinquishing to the fullest extent permitted by law (a) the provisions, rights and benefits conferred by Section 1542 of **the California Civil Code**, [Emphasis added] which provides: ["]A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.["].
> *S. para. 86.*

I think any policy to negate individual rights and contract law principles is fundamentally inviting catastrophe to economic stability, and goes against 4000 years of modified Roman Civil Law policies. Such Roman Civil Law had a place in Virginian polity in the 1600's and is foundational to the common rights of the people today. Such is extremely a public interest. This court must honor NFCU's exclusive *waiver provisio* for membership to be informed beforehand of all NFCU policy changes or procedure. Such would allow NFCU to continue to offer the best credit union services to the U.S. military and their families worldwide.

Nowhere in this litigation did I see a discussion of waivers, but I could not read all the briefs and motions. However, Counsel for Ms. Lambert and NVCU believe individuals may waive their personal rights:

> Plaintiff and each of the other Settlement Class Members agree that they are expressly waiving and relinquishing to the fullest extent permitted by law (a) the provisions. [New Para.] Nonetheless, each of those individuals expressly agrees that, as of the Effective Date, he/she shall have automatically and irrevocably waived and fully, finally, and forever settled and released any known or unknown, suspected or unsuspected, asserted or unasserted, liquidated or unliquidated, contingent or noncontingent claims with respect to all of the matters described in or subsumed by herein. .                                                                                *S. para. 86-87.*

If counsels believe waiver of rights is possible then they would arguably not contest Ms. Lambert's waiver of her right to be informed beforehand of NFCU policy changes.

Abbreviations appear herein.[2] I wish the Settlement compliance to oppose settlement had made electronic filing with the Court OK. It would have been a whole day easier for me.

---

[2]   App. (Appendix, often to this *Opposition to Settlement*);
C. (Ms. Lambert's *Complaint*);
DMM (USPS 2021 Domestic Mailing Manual);
ID (NFCU Important Disclosures document) *C. p. 19ff;*
JND (JND Legal Administration);
OOPS (NFCU Optional Overdraft Protection Service (OOPS) Disclosures);
OM2D   (Order Granting Motion to Dismiss for Failure to State a Claim)
PMISOF (Plaintiff's Memorandum in Support of Unopposed Motion for Attorney Fees, Costs, and Service Award.);

*Customer sues bank.*
*Dividends not paid that year.*
*Forgot! Stockholder!*

### B2.    JND's LEGAL NOTICE
#### *B2a    Postcard Service*

A receipt of a legal notice was upsetting to me, especially since I had to OPT OUT rather than OPT IN. I favor personally an opt-in process as it triggers less stress and radical upsets.

My first upset was receipt of a LEGAL NOTICE, *App. A*, with an improper postage indicia not conforming to USPS standards for Presorted First Class Mail even though First Class Mail was not required by the Settlement for mailing, *S. para. 57(a)*.

I mailed a letter to JND Administrator and counsels for both parties regarding the irregularity claiming JND owned the USPS additional postage now calculated at 42,926.96 dollars. *App. D.*

I claimed a reward for the pre-hearing disclosure as JND could fix the oversight before the March 26 hearing, rather than dealing with a potential Improper [Incomplete] Service Claim. At that time I presumed legal notices must be mailed with adequate USPS postage prepaid, as are summons and filings for Washington State courts, Washington Court Rules, CR 5(b)(2)(A):

> *(2) Service by mail* (A) If service is made by mail, the papers shall be deposited in the post office . . . with the postage **prepaid** [emphasis added]. . . .

Regardless, rewards are warranted when a citizen acts as an agent of the government:

> The government must be involved either directly a participant or indirectly as an encourager of the private citizens' actions before we deem the citizen to be an instrument of the state, *U.S. v Gumerlock*, 800 (9th Cir. *(en banc)* 792 cert. denied, 441 U.S. 948, 99 S. Ct. 2173, 60 L.Ed.2d 1052 (1979).

The USPS has a toll free number for reports of fraud, 1-800-372-8347 and may file such online, www.USPS.gov. The USPS does refer to improper postage as Revenue Short paid mail:

> Rule 4.4.1. **Definitions** Mailpieces with a postage discrepancy are those for which the total postage and fees affixed are not equal to the postage required. . . . *See* USPS 604

> Rule 4.4.5. **Postage Discrepancies Dispute Process.** Customers wishing to dispute postage discrepancies must do so electronically through the PES provider within 60 calendar days of. . . .                                    *See* USPS 604

And, the USPS requires postal employees to recover revenue shortages:

---

PMFFA (Plaintiff's Memorandum in Support of Unopposed Motion for Final Approval of Class Action Settlement.);
S. and Settlement (Settlement Agreement);
S&F (NFCU Services and Fee Schedule), *C. p. 29ff.*

> 4-1 **Revenue Protection and Assurance.** All Postal Service employees are responsible for preventing the loss of revenue by identifying and collecting short or unpaid postage and fees, uncancelled stamps, and misclassified mail. [New para.] Examples of revenue loss include the following: . . .**Short-paid mail** [emphasis added] . . . Improperly prepared bulk mailings . . . Assessment of wrong prices . . . Permit imprint mail deposited in collection boxes. . . .[etc.].
>
> *See* Sec. 4 Duties, Retail Operations Handbook, Handbook PO-209.

As to a review of JND's adequacy of class notice when sending USPS postcards, such seems such may be reviewed by a "standard of clearly erroneous" applied to a fact finding process, or possibly a standard of abuse of discretion.

It seems within JND's right in accord with the Settlement included use of Presorted First Class Mail, para. 57(a) ["for the purpose of mailing. . . ."], and that JND applied due diligence, *See App. C.* (email). However it may be a "him say, her say" argument as to whether the USPS employ knew if JND was to use the indicia on improper mail. Any USPS inspection of what was sent, and the records for such are with JND. The sent postcards are what determines short-falls or Revenue Losses for the USPS. What JND sent did not conform to current USPS guidelines. Maybe 904 DMM 3.5.5 was updated late in 2020. My research could not find out.

A fact finding would indicate that JND's indicia was "clearly erroneous." *See App. D&C.*

However, JND's choice to use the indicia on the postcard likely is not an abuse of discretion. The appropriate:

> Test for abuse of discretion is whether the [~~trial judge's~~ anyone] was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. Commonwealth v. English, Ky., 993 SW2d 941, 945 (1999).          *See Goodyear Tire and Rubber Co. v Thompson,* 11 SW.3d 575, (Ky. Sup. Ct. 2000).
>
> The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but "whether the court acted without reference to any guiding rules and principles." Dower, 701 SW2d at 241.          *See Cire v Cummings,* 134 S.W.3d 835 (Tex. Sup. Ct. 2004).

Applying these principles, it seems that JND may not have abused their discretion, just owes the USPS additional funds, and that USPS employees were likely in error or fraudulently in error for approving wrong indicia if they knew postcards would use Legal Notice on face; OR JND failed to disclose that "Legal Notice" would appear on the postcard's face to the permit giver. Such notations were not a problem in 2009 (later revised) for any postcard, *App. D, p. 4.*

JND did comply with FRCP 5(b)(2)(C) "mailing it to the person's last known address—in which event service is complete upon mailing." No designation of priority mail, first class

mail, or presorted mail seems required to comply with FRCP as in State rules. A delivery attempt seems adequate for the FRCP. The FRCP approval committee also says:

> The draft Rule 5(b)(3) submitted for consideration . . . concern was strengthened as a small number of opinions that say that service by mail is effective, because complete on mailing [is effective] even when the person making service has prompt actual notice that the mail was not delivered.          *See* "Committee Notes on Rules— 2000 Amended." . . . *Rule 5, Serving and Filing Pleadings and Other Papers.* www.Cornell.edu>rules>frcp. Accessed Feb. 22, 2021.

It is certainly unfair to the USPS to not get paid the proper rate when DNJ and USPS employees failed to heed the proper USPS rules regarding costs of delivering special attention notices, i.e. "LEGAL NOTICE" printed on the face of postcards, 604 DMM 5.3.5. *App. A.*

USPS 604 DMM 5.35 was revised after 2009 to apply not to standard mail that exempted postcards, but to apply to all U.S. mail with permits for Indicia including postcards; 2). that prior specific language for approved expedited handling be replaced with unofficial language that implied special handling; 3). And that the restriction to postal handling but be changed to "directly or indirectly expedited attention, handling, or delivery." Examples of unofficial words were "urgent", "Rush Delivery" or "Time Sensitive." I believe the word "Legal Notice" brings special attention by recipients upon receipt of the Postcard. JND's indicia also required a box due to the special intended special attention given legal notices, 604DMM 3.5.12. *App. F p. 4.*

JND's indicia was adequate for general mailing but not a LEGAL NOTICE! JND's Indicia must change for similar legal notice postcards in the future. Counsel asserts that JND did nothing wrong, *App. G.*

Because the facts indicate that a different indicia complies with current USPS regulations, that the court reduce the Settlement Fund by the amount DNJ owes the USPS, 42,926.96 dollars, so NFCU does not have to reimburse JND for their oversight/ neglect/ error. An adjustment to the Settlement provision to compensate NFCU for this seems appropriate.

My intent for early disclosure to JND and counsels was to allow JND to fix the oversight and pay USPS lost revenue due rather than make a potential USPS employee fraud claim first. JND, like NFCU, thinks they are not responsible though they followed all the protocols.

Everyone has to read the small print of contracted services, even Counsel. Though I personally think the old Roman idea of due notice is not valid when a "no trespass warning sign" was posted at the top of a tree outside of normal readability. Opting in implies having read the contract, being included and needing to Opt out is more like posting the Roman warning 'no trespass sign" outside of normal readability – just as the computer fine print clause of members

says if one visits their website they agree to all changes in terms of contract, though that alert is not on the web page as an obvious Warning sign! Mr. Diamond, Atty. of Seattle, and owner of all the Diamond Parking lots recognized the argument and kindly refunded my parking violation.

However, USPS 604 DMM 6.1 asserts,

> "6.1 Basic Standards <u>The mailer is responsible for proper payment of postage</u> [Emphasis added]."                *See USPS 604 DMM 6.1*

A postal discrepancy did exist at the time of mailing,

> Postage Discrepancies . . . 4.4.1 Definitions . . . Mailpieces with a postage discrepancy are those for which the total postage and fees affixed are not equal to the postage required for the applicable price and any extra services fees as determined by current, at the time of mailing. . . .                *See USPS 604 DMM 4.4.1.*

USPS discrepancies are handled by the sender paying the discrepancy,

> 4.4.3 Handling of Mailpieces with Postage Discrepancies . . . For mailpieces with a detected postage discrepancy when postage is due, corrective measures may include one of the following: . . . a. A payment adjustment from the customer, facilitated by the PES provider in the amount equivalent to the postage due, described in 4.4.4.
>                *See USPS 604 DMM 4.4.3*

JND owes the USPS for the short-paid discrepancy, and possibly other short-paid legal notices upon USPS inspection. Counsel believes I should report my dispute with the USPS. *See App. G-1.* I would rather play out time to see if JND reforms his perspective, or his ethics.

*Opposing letters*
*To class action settlement*
*Receiving reward.*

### B.2b    <u>Common Law Reward</u>

In order to avoid a needless lawsuit, NFCU owes me a reward for saving NFCU some expense in both filing this *Opposition to Settlement* and regarding JND's oversight in paying USPS proper first class postage rates.

England's pre 1776 common law affirmed that the finder of a man's wallet returned to rightful owner with money therein was entitled to a reward though cases did not always specify the nature of the reward, maritime law rewards were always at 10% for salvage and discovery of lost shipping cargo. *The Blackwall*, 77 U.S. (10 Wall) 1 (1870).)

> The court awarded the money to the bank, holding that it was entitled to possession of the money to the exclusion of all but the true owner. The court also held that Benjamin was a "finder" within the meaning of chapter 644 and awarded him a ten percent finder's fee. *See* [Iowa Code @ 644.13 (a finder of last property is entitled to ten percent of the value of the lost property as a reward). [new para]. Benjamin appealed He asserts alternatively that even under common law classes of found property, his is entitled to the money he discovered. He claims that the trial court

10

should have found that the property was treasure trove or was lost or abandoned rather than mislaid, thereby entitling the finder to the property.     *See Benjamin v Lindner Aviation, Inc.* 534 NW 2d 400, (Iowa Sup. Ct. 1995).

The Court in *Benjamin v Lindner Aviation, Inc.* 534 NW 2d 400, 402 (Iowa Sup. Ct. 1995) held that:

> Under common law, there are four categories of found property: (1) abandoned property, (2) lost property, (3) mislead property, and (4) treasure trove. *Ritz, 467N.W.2d at 269.* The right of a finder of property depends on how the found property is classified. *Id.* at 268-69. [new para.] A. *Abandoned property.* Property is abandoned when the owner no longer wants to possess it. *Cf. Pearson v City of Guttenberg,* 245 N.S.2d 519, 529 (Iowa 1976) (considering abandonment of real estate). Abandonment is shown by proof that the owner intends to abandon the property and has voluntarily relinquished all right, title and interest in the property. *Ritz, 467 N.W.2d at 269.* 1 Am.Jur.2d *Abandoned Property* @@ 11-14, at 15-20. Abandoned property belongs to the finder of the property against all others, including the former owner. *Ritz* 467 N.W.2d at 269.

The postcards seem abandoned property if JND does not pay what is owed the USPS.

Insufficient postage is usually delivered with a postage due stamp, or returned to sender. Revenue Loss to the USPS seems collectable upon USPS future inspection. *See 5.3.9(a), App. F, p. 5,* as USPS employees MUST collect postage due. USPS 604 DMM 4.4.3(c) & (a):

> c. Delivering the mailpiece to the addressee and collecting the deficiency as postage due.
> a. A payment adjustment from the customer, facilitated by the PES provider in the amount equivalent to the postage due, described in 4.4.4.

Odd, if the USPS abandoned collection of its debt, it would become abandoned property, under State abandoned property statues and common law, available for a finder of abandoned property. Personally, such finders reward of 10% might be able to bail out the USPS, or motivate employees to monitor the Presorted First Class Mail Paid indicia with special attention words.

JND seems to intend to relinquish all "right, title, and interest" in such, as JND has not yet disclosed to me that they voluntary paid the USPS the difference between what was paid and what is/ was owed. As not yet completely paid legal notices, they are an anomaly.

If JND does not pay the 42 thousand owed the USPS, I request this court to reduce the Settlement Fund by that amount so NFCU will not pay for JND's oversight from un-allotted funds. Such might assure me of a reward. And, help the USPS as well. JND is responsible to pay the discrepancy in postage. I wonder how far back the USPS can collect postal discrepancies?

*Old due process laws*
*Not current trending case law*
*In California*

11

*B2c   JND's Website*

I had no access to the four court documents filed Feb. 9, 2021 on JND's website, on Feb. 12, 13, 14, 15, 16, 17, 2021. *See App. H.* JND was to maintain a website, *S. para. 57(c).* Such set me back 5 days of editing this document as best I can.

Such management does not deserve NFCU reimbursement for all of JND's expenses. Let the Court pro-rate that loss of access.

Second Upset: I had to **opt out – not opt in! I was required to respond to this Legal Noticed!** The jargon this upset triggered was based on a Washington State Sovereignty idea that as citizens of Washington we do not yield our individual sovereignty to the government agencies that serve us. Such includes California legislated laws! RCW 42.56.030 reads:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created. This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected. In the event of conflict between the provisions of this chapter an any other act, the provisions of this chapter shall govern. [2007 c. 197 @ 2; 2005 c. 274 @ 283; 1992 c. 139 @ 2. Formerly RCW 42.17.251.]

Although this has to do with the right to know, public disclosure, it most certainly implied that JND's website should make available all of counsel's briefs and memorandums for Washingtonians to be fully informed. And to think Ms. Lambert's case is all about legal disclosure! LOL. I notified JND of the website challenge via emails. JND made no response to emails to fix the problem. *See App. I.* I wish JND's phone allowed me to leave a phone message, as *S. para. 60(d)* implies. I asked counsel for copies on Thursday, Feb. 18, *See App. I.* JND's web page was fixed on Feb. 19, *See App. H,* six days after I emailed them, *See App. G.* I got a reply on Feb. 23 about being in or out of Settlement after I presented JND the postcard identifier. *See App. K p. 2.* These are shortcoming by JND that do not deserve remuneration from NFCU, our member-owner benefit money. I suggest that the Settlement fund be reduced to compensate NFCU, us member-owners, for this lower than required Settlement behavior by JND.

*Legal Notice Sent.*
*Presort postage not all paid.*
*Green, Be-wilder-Mints.*

### B2d    *JND'S Website Question #16*

JND's website Question #16 asserted that NFCU members that opted out of the law suit were not allowed to comment because:

> If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you.

This is a false perception by JND in not understanding that NFCU as a non-profit federal credit union owned by its member-owners composed exclusively of U.S. Military members and their families. It is more like a nonprofit association of individuals or a club with benefits and responsibilities rather than simply a for-profit bank with customers. NFCU member-owners vote board members to represent them – some serve voluntarily. CEOs of banks are paid.

JND's perception of NFCU share-members who opt-out "will not be affected" does not understand that this case does not take profits from a for-profit organization to give to its settlement Class. Ms. Lambert, and those similarly like her, seek to take assets from their fellow NFCU partners, member-owners – assets that would provide lower cost services to all NFCU member-owners. It is like stealing from your brother's piggy bank and expecting him to afford to take you to lunch every day! The perception of this case to this court that Ms. Lambert and her Counsel continue to perpetuate is appallingly WRONG!

*Calls to JND,*
*Many message options,*
*No weekend workers.*

### B2e    *JND's Administrative Costs*

Third Upset: NFCU paying for JND's administration errors. JND's postcard said,

> "All settlement Administrative Cost are being paid separately by Navy Federal."

JND refused in an email from California that JND would not give me information about how many Legal Notice postcards were sent, or any information about indicia as they were not required to do so. Usually a quisi-public corporation, private owned public service company such as utilities and railroads, are required to keep accounting books available to public at all times. Why not JND?

JND's expenses for mailing & re-sending postcards is below my expectations and USPS standards. As such, does not deserve to be reimbursed by NFCU, para. 66.

*Trending in court cases,*
*California decisions.*
*Legislated law.*

13

## B3.   CERTIFICATION

The Settlement requests this court to conditionally approve certification. *S. para. 50:*

> 50. For Settlement purposes only, Plaintiff and Navy Federal agree to ask the Court to certify the Settlement Class under the Federal Rules of Civil Procedure.

Such a provision seems to request this Court to approve certification so the case law cited therein is not red flagged for future reference in other litigations.

*Much legal reading.*
*Class action law suit.*
*No case distinctions.*

### B3a   *One Person Representative?*

Can 100 photos of *homo sapien* women represent all the female species on planet Earth? i.e. apes, gorillas, jackasses and swine? Can one public steam railroad represent city trolley cars, street railroads, and private logging railroads? Can one upset Monopoly player receiving a "Go to Jail" card represent all the incarcerated? Can one high-school football player represent all football players, even English soccer players? Can one banking "customer" represent the financial institution customers of off-shore accounts, crypto currency buyers, or federal credit union members? Varying rules and regulations of different playing arenas are different and more controlling than unproven/ unexamined/ uncertified public assertions.

No class action lawsuit listing one individual to represent other "similarly situated" persons ought to be expanded beyond that one person's actually experience. Ms. Lambert *Complaint's caption* self-limits her representation "on its face" to only *Homo Sepiens* "similarly situated." "Similarly situated" simplified, deleting all legal semantics and case law, means that I am sitting in a similar chair as Ms. Lambert, or I am sitting in a similar manner as Ms. Lambert. To "sitting similarly" (same chair) is not "sitting analogously" (different categories but similar), as this case's national class membership was expanded to include at least three types of categories of resentment NSF fees: $29, $20 and $10 fees.

Ms. Lambert only represented "customers" of NFCU to which NFCU only has "member-owners" excluded from the Settlement Fund, *S. para. 44, saying,* "[e]xcluded from the Settlement Class is Navy Federal, parents . . . officers and directors. . . ." The case and Settlement ought to be dismissed for lack of certification-ability that is presumed. *S. para. 50.*

This Settlement is only made possible by the confusion created by not distinguishing "customers" of for-profit banks from NFCU nonprofit "member-owners" who waived the right to be always before warned of changes in NFCU policies and practices. This Settlement and case is inappropriately based on banking law cases, and California legislation; and not ENTIRELY on

federal credit union cases to the loss of the intended distinctions and purpose of the U.S. government in 1970 to create more flexibility and lower overhead costs to federal credit unions, especially the nonprofit NFCU that serves the U.S. military and their families by invitation only. Sponsoring NFCU members can withhold important access code and personal SS number. NFCU is more ANALOGOUS to an exclusive club that banks & loans money to members only rather than a bank that serves the general public.

Each of the other resentment NSF fees for $20 and $10 for categories of NFCU members ought to taken out of the Settlement Members as unrepresented by Ms. Lambert in her *Complaint.* Her counsel certainly interviewed other members and could have listed them as plaintiffs but failed to do so. Such could be to their detriment as too presumptive lawyers.

There is much need to add common sense to this litigation.

> *Inadequate Poste,*
> *Legal notice delivered,*
> *Ten cents postage due.*

### *B3ai    No Divergent Interests Among Members?*

Counsel is presumptuous. As *Pliny the Elder* (23—79AD), the author of the 1st encyclopedia who died commanding the Roman Navy to sail into burning Pompeii to rescue survivors said,

> [O]ne thing seems certain – that nothing certain exists and that there is nothing more pitiful or more presumptuous than man. *Pliny the Elder* 23-79 CE,

Others since then have also expressed similar sentiments:

> A modest man is steady, a humble man timid, and a vain one presumptuous. *Mary Wollstonecraft* (1759—1797); Author, philosopher, woman's right advocate.

> It's most presumptuous to believe we already know all the answers and will never get any more big surprises. *Stanley Schmidt.* (1944—). Science Fiction author and editor.

Counsel presumed that there existed no diverging interest other than Ms. Lambert's:

> Plaintiff's interests are coextensive with, not antagonistic to, the interests of the Settlement Class, because Plaintiff and the absent members of the Settlement Class have the same interest in the relief afforded by the Settlement, and the absent members of Settlement Class have no diverging interests. *See PMISOF para. 65.*

I disagree, the true heart of a NFCU member-owner is to assist NFCU to achieve its Vision statement:

> [NFCU To Be] the most preferred and trusted financial institution serving the military and their families. *See NFCU 2019 Annual Report, p1.*

15

Ms. Lambert's sentiments do not match those of the silent majority NFCU member-owners, whether opted- out or in this Settlement, if they could put words to their true wishes. Ms. Lambert does not represent them. She represents mostly her own plight and ignores the helping hand of NFCU to assist her with a variety of options, even help balancing her checking book.

*Boxing like the past*
*Lawyer's tactics prevail, 'til . . .*
*Rocky Bilboa.*

### B3aii Sitting in the same chair

FRCP Rule 23(a)(1) requires that

"The class is so numerous that joinder of all members is impracticable."

Ms. Lambert's *Complaint* representation of a large NFCU class does not meet the requirement of numerosity when Ms. Lambert falsely asserts that she did not agree with NFCU's non-disclosure of NFCU re-sentment NSF fees she labels "resentment" fees. Ms. Lambert had an account with NFCU as "Ms. Lambert offers an example of NSF Fees that should not have been assessed against her checking account." *C. para. 21.*

Ms. Lambert asserted that no NFCU "customer" agreed to resentment NSF fees:

> Nowhere does NFCU disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, **nor do NFCU customers ever agree to such fees** [Emphasis added]. *See C. para. 42-44.*

> But NFCU's Account Documents never disclose that this counterintuitive and deceptive result could be possible and, in fact, **suggest the opposite** [emphasis added]. *See C. para. 7.*

> Banks and credit unions like NFCU that employ this abusive practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—**something NFCU never did** [emphasis added]. *See C. para. 46.*

Lambert, like all NFCU members, when they opened a NFCU account did by signing an application enter into a CONTRACT with NFCU and agree to NFCU's "abusive" practices of processing re-sentment NSF checks and not disclosing the exact process to members WITH MEMBER-OWNER'S CONSENT:

> Upon verification of eligibility following submission of a completed membership application and acceptance for membership by the membership officer, and upon purchase of at least one share ($5), a Membership Savings Account will be established in your name, indicating that you are a member-owner of Navy Federal Credit Union (Navy Federal). . . . **By signing your original membership**

**application,** you and your joint owners(s), if any, agree to abide by the properly disclosed terms and conditions of all accounts or services that you may receive at Navy Federal. [Emphasis added]. . . . **The terms and conditions of these accounts and services are subject to change without notice to you,** [Emphasis added] unless prior notification is required by law.                              *See* "Membership / Membership/ Savings/Checking Disclosure Statements", *ID p. 1. C. p. 20.*

Lambert actually does not "sit in her chair" as a "bank customer" as she and her counsel often claim, but "sits in her chair" as a member-owner of NFCU, exempt from settlement fund appropriations in the Settlement. Para. 44:

> Excluded from the Settlement Class is Navy Federal, its parents, subsidiaries, affiliates, officers and directors, all Settlement Class members who make a timely election to be excluded . . . .

Can you imagine how little work Lambert's Counsel did to insert NFCU for a typical bank name in this Settlement? Ms. Lambert's counsel's parroting prior successful boxing technique upon a new opponent and expecting to win is not only unwise, it is a physically recognizable "die-a-nosed" condition in the fighting arena known as "arrogant blindness." This is self-incriminating to Lambert's Counsel's disproportionate claim for 33 % Settlement fees for hours spent in legal research.

Can you see how Ms. Lambert "Sits in the same chair" as all NFCU members **who accepted nondisclosures** by NFCU?

Additionally, Ms. Lambert's *Complaint* and argument only referenced NFCU's $29 re-sentment NSF fees. NFCU has a $20 re-sentment NSF fee for *overdraft protection accounts:*

> We provide Overdraft Savings Transfers that are included at no additional cost with your checking account. . . . 1. [With OOPS] We will charge a fee of $20 each time we pay an overdraft. 2. We will not be charged a fee on transactions of $5 or less . . If your checking account does not have sufficient funds to cover a check or ACH transaction, we will first attempt to pay the overdraft at no charge through Overdraft Savings Transfer from your linked savings account. . . .
> *See* NFCU "Standard Practices and Fees", *See OOPS p. 1. App. E.*

NFCU has a $10 re-sentment fee for accounts with *checking lines of credit:*
> We provide **Checking Line of Credit** *(CLOC),* which requires credit approval and may be less expensive than our fee-based overdraft program. . . . *Id.*

Ms. Lambert, as one person, did not have these NFCU services attached to her account. Ms. Lambert then could not qualify, as one person, to represent people who did, as the NSF fees differ, and the protections differ. **The State of Virginia like some non-pro-active class action States, require that the Class Representative's listed plaintiff's represent the alterations in how the Class Representative is "similarly situated."** If so, Ms. Lambert's Counsel and

17

argument would be justifiably be included in the Settlement Fund dispersion, as an honest class action suit. Ms. Lambert could not, and did not, fairly represent individuals with checking account protection, not being one by herself, and arguing examples of such situations other than her one $29 Resentment fee.

NFCU also differs from bank accounts as NFCU does not have a $1 NSF fee for ATM NSF requests as banks do. *See Complaint App. 32, S&F p. 3.* Ms. Lambert could not, and did not include such, though her Counsel's argument and class definition could embrace such, as in other banking institution class action litigations.

The Settlement Class Membership class should be reduced to represent only the $29 resentment NSF fees Ms. Lambert claimed, as other NFCU member-owners were not "sitting in a similar chair," nor looking like her "sitting in her chair."

Even if clarity is added to NFCU's disclosures, which Lambert's counsel may likely prove, a protest for damages and refunds is void with such a disclosure. The acceptance of undisclosed practices is part of NFCU's contractual disclosures and is determined appropriate or inappropriate on simple contract law principles. These principles need not be elaborated here other than saying that Ms. Lambert's assertions are false and inconsistent with the terms of NFCU's membership-owner contract in the Commonwealth of Virginia. *Chas. H. Tompkins Co. v. Lumbermens Mut. Cas. Co.*, 732 F. Supp. 1368, 1374 (E.D. Va. 1990) held that:

> In Virginia, it is settled beyond dispute that while ambiguity is no longer a prerequisite before custom and usage may be used to supplement or explain a contract, this type of extrinsic evidence may not be used where it is inconsistent with the express terms of the contract. *See Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 8-9 (4th Cir. 1971); *Piland Corp. v. REA Constr. Co.*, 672 F. Supp. 244, 247 (E.D.Va.1987); Va. Code Ann. § 8.1-205(4). Fn #7 ["Va. Code Ann. § 8.1-205(4) provides: The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade. [new para.] This Uniform Commercial Code provision is enacted in Article 1, the General Provisions. Accordingly, it is not limited merely to contracts for the sale of goods, but extends to all commercial contracts. Moreover, this provision arguably supports the construction of noncommercial contracts by analogy. *See* E. Farnsworth, *Contracts* 507-08 (1982).

NFCU's members acceptance clause in the *Important Disclosures* trumps any external statements of Ms. Lambert applicable to other banking customers rather than to any member-owner of NFCU. And as such, she does not pass the Numerosity test as required by Rule 23 to be worthy of a class action suit against NFCU.

18

Besides, if Ms. Lambert could represent a customer class of NFCU members, as NFCU member-owners may not receive any benefit of the class action, being excluded from any benefit as the owners of NFCU, Settlement para. 44.

> *Some watches run well*
> *Old, dirty, dry oil, loose parts . . .*
> *Rubies not for show.*

*B3aiii*        *In Support of Ms. Lambert*

In support of Lambert's Counsel it is important to note that

> State and Federal Credit Unions are subject to the provisions of Regulation E . . . In 2009, the Federal Reserve Board (Board) amended Regulation E to prohibit overdraft fees for ATM and one-time debit card transactions, unless the consumer opts in or affirmatively consents to the overdraft services.    *See* "Overview" Electronic Fund Transfer Act (Regulation E). www. ncua.gov > manuals. Accessed Feb. 13, 2021.

Ms. Lambert did not opt in to OOPS. If she had she would have not been charged a $29 NSF fee, as NFCU NSF fee on a *checking line of credit* is t$10; for OOPS it is $20.

> We offer **Checking Line of Credit** *(CLOC)*, which requires credit approval and may be less expensive than our fee-based overdraft program. . . . We will charge a fee of $20 each time we pay an OOPS overdraft. . . Enrolling in OOPS does not guarantee that we will pay overdrafts. Navy Federal Credit Union pays overdrafts at our discretion. If we do not authorize and pay an overdraft, your transaction will be declined and/or your check/ACH will be returned, unpaid. . . . If your checking account does not have sufficient funds to cover a check or ACH transaction, we will first attempt to pay the overdraft at no charge or through Overdraft Savings Transfers from your linked savings account *(your membership savings account)*, provided it has sufficient funds available, before using OOPS. Through Overdraft Savings Transfers, we will only use funds from a linked savings account to pay a check or ACH overdraft transaction if there are sufficient funds available In the savings account to cover the full amount of the overdraft transaction.        *See OOPS p. 1, App. E.*

Ms. Lambert could not represent unauthorized OOPS redundant NSF resentment fees, for not only is she not "similarly situated" as they; OOPS disclosures are satisfactory and members who [opt-in] sign an application for the OOPS contract service. All OOPS member-share-owners have a new signed contract for the NFCU OOPS service:

> When you sign up for OOPS, we may pay overdrafts under OOPS, and you will be assessed an OOPS fee. ... 1. You will be charged a fee of $20 dollars each time we pay an overdraft. 2. You will not be charge a fee on transactions of $5 or less. 3 . . . or after the end of the business day is less than $15.

The Class Membership size must be reduced to exclude NFCU OOPS memberships.

19

*Investigators,*
*Blinded in the sight of cash,*
*Describe elephants.*

### B3b   *Member-owner, "Customer" Confusion*

If Ms. Lambert's assertion to never accept resentment NSF fees is found to be fraudulent or misleading then she has committed common law fraud by her intentional false and misleading representation of NFCU member-owners as simply "customers"; OR her assertion represents or constitutes a common law claim for negligent misrepresentation or fraudulent concealment.

Fraud is historically so appalling to courts that a court will open up for reexamination an ancient municipal ordinance to vacate a city street if fraud is shown, especially if someone has been denied a vested right, *Fry v. O'Leary,* 141 Wash. 465, 469; 252 P. 111 (1927). Lambert's non-disclosure of her acceptance of unannounced changes in NFCU's policies and procedures is critical. This court must consider NOT accepting this Settlement, and dismiss the case. Lambert, as a NFCU member-owner, did not appropriately represent other NFCU member-owners in this law suit. Certification should be denied, or mandatory prior to acceptance of this Settlerment.

This court may dismiss Ms. Lambert's litigation and Settlement. The Court Order to dismiss in *Gunter v United Fed. Credit Union,* (2016)[3] reasoned concerning FRCP 8(a)(2) that:

> A properly pled complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v Twombly,* 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 US 662,678 (2009). (*citing Papasan v. Allain,* 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to rise above the speculative level." *Twombly,* 550 U.S. at 555. Thus to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 786 (internal citations omitted) . . . In *Iqbal* the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, . . . Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged – but not shown – that the pleader is entitled to relief." *Id.* at 679 (internal quotations marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly,* 550 U.S. at 570.

---

[3] "Order (Motion to Dismiss)," Gunter v. United Federal Credit Union et al, No. 3:2015cv00483 - Document 94 (D. Nev. 2017) :: Justia. https://justia.com/cases/federal/distric-courts/nevada. Accessed Feb. 13, 2021.

Concerning Rule 8(a)(2) it is not my belief on the face that NFCU is liable for the misconduct given the fact of Ms. Lambert's signed waiver. Certification should be required prior to any court settlement in all class action suits! That is a public concern.

Also, *Papasan v Allain*, 48 U.S. 265, 286, 106 S. Ct. 2932 (1986) asserted that courts:

> Are not bound to accept as true a legal conclusion couched as a factual allegation." . . . "Factual allegations must be enough to rise above the speculative level."

Ms. Lambert's assertion as a "customer" is only speculatively aligned with other case law on similar issues. The nondisclosure of Ms. Lambert being a member-owner of NFCU is critical. Her *Complaint* is plausible for uncontracted customers of typical banks, but not plausible for the non-profit NFCU. Ms. Lambert's assertions are also not reasonable for member-owners, as they circumvent NFCU's contract provision that all member-owners accepted NFCU's non-disclosure of all their policies and procedures, even Ms. Lambert; and all NFCU members are voting shareholders in NFCU.

Therefore Ms. Lambert's cannot represent banking customers in typical for-profit banks that pay U.S. taxes. The case law of typical banks must not be argued for federal credit unions, regulated differently under different Congressional charters or regulatory agencies.

If Ms. Lambert's counsel did not see "member-owner" in NFCU's Important Disclosures surely Ms. Lambert's counsel did not know by the Settlement's provisions that Ms. Lambert could potentially be restricted from receiving NSF reimbursements, and that NFCU services for her could be restricted for causing excessive costs to NFCU by a NFCU member vote! *ID p. 1.*

Ms. Lambert and counsel repeatedly used the word "customer" in briefs, and never a member-owner. Ms. Lambert uses the term "customers" twenty-five times in her *Complaint.* This confusion is evident especially in the Settlement where both parties excluded "Navy Federal its partners, subsidiaries, etc. from the Settlement. *S. para. 44.* That potentially includes Ms. Lambert and the rest of her Settlement Class.

This distinction is important, as such distinguishes federal credit unions, i.e. non-profits owned by memberships, from typical federal banks serving the public. Much of Ms. Lambert's counsel's citation to banking policies and procedures may apply, but the seeking compensation from members who may have waived the provision to be per warned of changing banking policies is grounds to discredit collection of damages and fees. The distinction must be made.

*young lawyer in court*
*Calls doctor to testify*
*On Ultra Virus.*

### B3c    *Fraud or Misrepresentation*

Ms. Lambert asserted in her *Complaint* that she had an account with NFCU. *C. para. 23:*

NFCU rejected payment . . . due to insufficient funds in Ms. Lambert's account.

And, Ms. Lambert's Counsel focused on NFCU's nondisclosure of their processing procedures:

But NFCU's Account Documents **never disclose** [emphasis added] that this counterintuitive and deceptive result could be possible and, in fact, suggest the opposite. *C. para.7.*

Nowhere does NFCU disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, **nor do NFCU customers ever agree to such fees** [Emphasis added]. *C. para. 44.*

However, signing an application to open a savings, checking accounts in NFCU is a contract that made Ms. Lambert a share owner in the company, a member-owner with voting privileges:

Upon verification of eligibility following submission of a completed membership application and acceptance for membership by the membership officer, and upon purchase of at least one share ($5), a Membership Savings Account will be established in your name, indicating that you are a member-owner of Navy Federal Credit Union (Navy Federal). Membership at Navy Federal comes with certain ongoing responsibilities. **By signing your original membership application, you and your joint owners(s), if any, agree to abide by the properly disclosed terms and conditions of all accounts or services that you may receive at Navy Federal.** [Emphasis added]. You also agree to keep Navy Federal informed of your current mailing address. **The terms and conditions of these accounts and services are subject to change without notice to you** [emphasis added], unless prior notification is required by law.          *See* "Membership/ Membership/Savings/Checking Disclosure Statements", *ID p. 1.*

Counsel for Ms. Lambert asserted that they drafted and investigated the *Complaint,*

Class Counsel reasonably expended 1,163.2 total hours litigating this Action. (fn 4- some projected future hours) . . . Over the course of the litigation, in addition to investigating and drafting the Complaints . . .          *See PMISOF p. 16.*

It seems to me that one of those essential hours was discovery of ID p. 1 and their plaintiff being a member-owner rather than a public customer of NFCU services, and that a waiver of right to be fully informed was a part of membership.

Counsel for Ms. Lambert signed her *Complaint. C. p. 17.* It is commonly known that an attorney's signature constitutes a certification to the court that their client's claims have merit to the attorney's best knowledge. But such an assertion must be based on actual investigation that Ms. Lambert's counsel conducted. But that investigation must be REASONABLE under the

circumstances of the particular case. *Bryant v Joseph Tree, Inc.,* 57Wn.App. 107, 791 P.2d 537 (1990), affirmed, 119 Wn.2d 210, 829 P.2d 1099 (1992).

What is reasonable must be at the time of the filings, *Briggs v. Vail,* 124 Wn.2d 193, 876 P.2d 448 (1994). There are seven factors in assessing reasonableness, *Miller v Badgley, 51 Wn.App.* 285, 753 P.2d 530 (1988). These include 1) time available to signer; 2) extent of attorney reliance on others; 3) including forwarded case from another attorney; 4) the complexity of issues; 5) need to establish the factual bases of claim; and 6) the plausibility of success.

In Washington an attorney's "blind reliance" on a client's statements seldom constitutes a reasonable inquiry. *Miller v Badgley.* But reluctance to assert a baseless finding must be after adequate time for discovery, *Bryant v Joseph Tree, Inc.,* 119 Wn.2d 210, 829 P.2d 1099 (1992). Seeing no certification in Lambert v NFCU we do not believe the case has merit for Settlement.

In Washington, it is not enough for Counsel to simply affirm belief in client's claims, but cite the authority for believing such. I did not see any reference to discussion on the legality of contract waivers in Virginia in the documents I read. And, Counsels for both parties claim the validity of waivers in the Settlement agreement itself. What a conundrum of contractions how the magical words of attorneys distract us from common sense.

In Washington, it is not enough for Counsel to believe the claim is meritorious, the claim must pass an objective standard of evaluation. *Harrington v Pailthrop,* 67 Wn.Aoo, 901, 841 P.2d 1258 (1992), review denied, 121 Wn.2d 1018, 854 P.2d 42 (1993), *Reinhart v Seattle Times,* 59 Wn.App 332, 798 P.2d 1155 (1990).

The factual evidence that Ms. Lambert signed a waiver of knowing beforehand any NFCU policy changes to become a NFCU member is significant. In Washington we let citizens waive contract rights, not like in California where such are sometimes legislated as unlawful. Our view of the law is ours, and is both plausible and long established based on English common law and Roman Civil law, with legislative alterations to make it compatible with such.

This case is not only factually frivolous, it is legally frivolous. Though I do admit, that there is always a need for clarity, in banking polices, NCUA regulations, and laws and government policies in general, especially Executive Orders that President Lincoln discovered did not control over lands assigned to the DOI, a department of Congress and not the White House.

This case did present debatable issues around resentment NSF fees. For that Ms. Lambert's counsel has done a service to the public, but not to the detriment of NFCU with a

signed waiver by Ms. Lambert. Some fees for counsel are ethically reimbursable in a mutual Settlement, but not 33%.

Consequently, the NFCU members that are sovereign citizens of Washington State do not accept any Settlement on this case, such being contrary to common sense, and the laws of Washington. Consequently, we request that the court retract the NFCU Settlement Members of Washington from the Settlement, and reduce the 16 Million Settlement Fund accordingly.

*Ignoring State rights,*
*Federal Class Action wins*
*No case distinctions?*

### B3d   Objection: Para. 44/ Settlement Class

Para. 44. "Settlement Class" means all current and former Navy Federal members in the United States who were charged Representment NSF Fees during the Class Period. Excluded from the Settlement Class is Navy Federal, its parents, subsidiaries, affiliates, officers and directors, all Settlement Class members who make a timely election to be excluded, and all judges assigned to this litigation and their immediate family members. 45. "Settlement Class Member" means any person included in the Settlement Class who does not opt-out of the Settlement. 46. "Settlement Class member" means all members of the Settlement Class.                    *See para. 44-46.*

The result is that all NFCU share-owners are excluded from the Settlement Class as owners similar to owners in an employee owned business are owners. Even NFCU members who are "inactive" are not excluded from share-owner status until their savings account is closed and membership ceases:

A balance of at least one share ($5) is required to establish and maintain membership. The balance in your Membership Savings Account must not be reduced below the value of one share ($5) at any given time. If your Membership Savings u maintains a balance of less than a share ($5) for 180 consecutive days, the Membership Savings Account may be closed, thereby terminating your membership . . .The [Inactive Member Fee] will be assessed until you meet one of the criteria listed above or the Membership Savings Account is closed, thereby terminating your membership.
*ID p. 1.*

By the Settlement's own criteria share-owner status of NFCU members are excluded from the Settlement Classes, and the class action is void for lack of Numerosity, FRCP Rule 23(a)(i), or Adequacy, Rule 23(a)(iv). Lambert's national qualifying class of one petitioning NFCU member actually is so small a class action suit is unverifiable, being less than 1000 who contest signing the membership contract, but such not listed in Ms. Lambert's *Complaint*:

Federal Rule of Civil Procedure, Rule 23(a), provides that an action requires four conditions to qualify for class treatment: (i) the class must be so

24

numerous that joinder of all members is impracticable. (ii) there must be questions [of] law or fact common to the class, (iii) the claims of the representative parties must be typical of the claims of the class, and (iv) the representative parties will fairly and adequately protect the interests of the class.

[new para.] First, some courts have held that numerosity is usually established when there are at least 40 class members. Others have concluded that no fixed number of class members is sufficient, and that the court must consider other factors such as geographical dispersion or the nature of the action.

[new para.] Second, after the U.S. Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S. Ct. 2541 (2011), merely reciting a list of common questions is not enough to show commonality. Instead, a court deciding the commonality of factual issues must rigorously analyze the plaintiff's contention that these issues can be proven on a class wide basis: "[w]hat matters . . . [is] the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation." . . .

[new para.] Lastly, the adequacy requirement determines whether the interests and incentives among the plaintiffs and the rest of the class are aligned, or if, by contrast, the class action is not in the interests of all class members. . . .

*See* Rule 23(a): Numerosity, commonality, typicality and adequacy, "What are the Requirements for Class Certification Under Federal Rule of Civil Procedure 23", BonaLaw | PC Antitrust & Competition, www. businessjustice.com. Accessed Feb. 8, 2021.

The numerosity and adequacy requirement on the face or title of Lambert's *Complaint* requires PERSONS filing, not just one PERSON. The sentiment of other NFCU share-owner members do not go along with taking assets of NFCU to repay NSF fees of members who choose to not Opt In to overdraft protection, or establish a *checking line of credit.* OOPS p. 1, *See App. E.*

> *Legal Magicians*
> *With clever slights of hand tricks,*
> *Hide what's important.*

### B3e   *Numerosity*

Common English tells me that Ms. Lambert may not be "similarly situated" as all of the other NFCU members, even those with Resentment NSF fees. The qualifying Settlement Fund recipient group must be reduced in size, and the Settlement funds accordingly. Ms. Lambert's assertions of "Similarly Situated" means without all the linguistic common English definitions and semantics: Either **"I sit in a chair like Lambert"**, or **"I sit like Lambert in a chair."** The

English word to expand Ms. Lambert's "similarly situated" more correctly is analogously situated meaning different categories but alike.[4]

*Changing business law,*
*Contract waivers illegal,*
*Californian law.*

### B3f   Adequacy

Adequacy requirement "determines whether the interests and incentives among the plaintiffs and the rest of the class are aligned." *Id.* They are not.

Many NFCU members-owners, in or out of Settlement class, if they knew that unclaimed moneys of the Settlement, Residual Fund, would be prorated and dispersed to resentment NSF account recipients unequally, (presumably less to those members who have some kind of overdraft protection and more to those who have many NSF fees), and that such disbursements could raise the costs of NFCU services WOULD OBJECT to the Settlement even though 16 Million is only about 2 dollars per NFCU worldwide membership of 10 Million.

Also Ms. Lambert has been curt and terse with her comments about NFCU's abuse. Such is not the sentiment of many military personnel and their families who receive low cost benefits from NFCU. To me it seems Ms. Lambert sadly personified her strong demeaning resentments about her resentments concerning NFCU's re-sentment NSF fee and projected the self-abuse onto NFCU. My first impression, in not knowing what a "resentment" NSF fee was, thought of such as a "Freudian slip." LOL. I still do – knowing that the corrected spelling is re- sentment NSF fees. Ms. Lambert asserted harsh accusations in her *Complaint* that are indicative of her intentions to discredit, demean, and likely fraudulently steal assets from NFCU through misrepresentation of her acceptance of NFCU's member-owner contract provision for waiving her right to prior

---

[4] **"similar,** adjective . . . 1: having characteristics in common : strictly comparable[;] 2: alike in substance or essentials : CORRESPONDING[;] 3: not differing in shape but only in size or position // *similar* triangles // *similar* polygons . . . **similarly** *adverb* . . . **Choose the Right Synonym for** *similar*[:] SIMILIAR, ANALOGOUS, PARALLEL Mean closely resembling each other. **SIMILAR implies the possibility of being mistaken for each other.** [Emphasis added] // all the houses in the development are similar. // ANALOGOUS apples to things belonging inessentially **different categories but nevertheless having many similarities** [Emphasis added] // Analogous *political systems* // PARALLEL suggests a marked likeness in the development of two things. // the *parallel* careers of two movie stars // *See "Similar." Merriam-Webster.com Dictionary,* Merriam-Webster. https://www.meriam-webster.com /dic tionary/situated. Accessed Feb. 6, 2021.

disclosures of policy changes. "Plaintiff Lambert . . . reviewed documents provided to her by counsel," *PMISOF p. 22*. Ms. Lambert's attitude is expressed in her choice of words in her *Complaint*:

> Para. 56. [It NFCU] abuses that discretion to repeatedly reprocess transactions
> Para. 62. damaged by NFCU's misconduct in that she has paid assessed unfair and unconscionable NSF Fees. Furthermore, the factual basis of NFCU's misconduct is common to all members of the Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.
> Para. 66. the Classes will continue to suffer losses and NFCU's misconduct will proceed without remedy.
> Para. 68. necessary to restrain NFCU from continuing to commit its unfair and illegal actions.
> Para. 75. Subterfuge and evasion violate the obligation of good faith . . . abuse of a power to specify contract terms. . . .
> Para. 76. NFCU abuses that discretion to take money out of customers' accounts without their permission. . . .
> Para. 52.NFCU exercises its discretion in its own favor—and to the prejudice of Ms. Lambert and its other customers . . . Further, NFCU abuses the power it has over customers and their credit union accounts. . . .

Even though Ms. Lambert promises herself to be fair to the class:

> Accordingly, Ms. Lambert is an adequate representative and will fairly and adequately protect the interests of the Classes. *C. para. 65.*

Ms. Lambert affirmed that she

> "has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.                    *See C. para. 61.*

The interests Ms. Lambert seeks are remunerations as refunds and damages for her resentment NSF fees. NFCU member-owner interests are expressed in NFCU's Vision Statement:

> "To be the most preferred and trusted financial institution serving the military and their families."                    *See NFCU 2019 Annual Report, p. cover.*

Ms. Lambert's *Complaint* illustrates that she cannot be fair by her bad faith in NOT disclosing her compliance with the spirit of NFCU's contract that accepted non prior disclosure of some of NFCU policies and practices. Ms. Lambert understand and affirm that:

> 74. Under Virginia law . . . every contract carries with it an implied covenant of good faith and fair dealing. Good faith and fair dealing . . . means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. The covenant requires faithfulness to an agreed common purpose [or mission statement] . . . Evading the spirit of the bargain . . . constitute examples of bad faith in the performance of contracts.                    *See C. para. 74.*

27

The spirit of NFCU as a non-profit entity is to return all profits back to member-owners in the form of low cost benefits and services, allowing NFCU to be more flexible than federal or state banks; and potentially paying membership dividends on surplus income back to military members and their families. The distinction between banks and credit unions must be understood, respected and distinguished.

> Banks are for-profit institutions. And most are *very* profitable. FDIC-insured institutions had a net income of 60.2 billion in the second quarter of 2018. Banks pay taxes on the profits they earn, and many are publicly traded companies with paid board members to answer to. [new para.] Credit unions are not-for-profits, so they're generally exempt from federal taxes. Some even receive subsidies from organizations that sponsor them. [new para.] Banks . . . often charge higher fees than credit unions and pay lower rates to consumers. Credit unions, . . . charging less interest on loans, charging lower fees and paying higher rates on savings accounts. They may also pay dividends to members if the credit union has surplus income. *"For-profit vs. nonprofit."* What is the difference between a credit union and a bank?" (updated Dec. 3, 2020). www.credit karma.com. Accessed Feb. 17, 2021.

Chase Morgan banks do establish many of the standards in banking, the firm boasting that half the homes in America bank with Chase.

> [Chase Banks are] proud to serve nearly half of America's households with a broad range of financial services. . . . *See,* "About Us – Helping you make the most of your money." Empowering your life. Chase. www.Chase.com. Accessed Feb. 6, 2021.

> [Chart]

| Rank | Bank name | Total assets |
|---|---|---|
| #1 | JPMorgan Chase & Co. | 2.87 trillion |

> *See*: An, Lian, Christopher Baynard, Chiradip Chatterjee, Chng Ping. "Locational Study of ATMs in the U.S. by Ownership ATM Analysis [2018]." Pdf. www.akleg.gov>get. Accessed Feb. 5, 2021.

NFCU's membership is about 7 Million in the U.S. population of 312 Million people. Ms. Lambert's class action suit helps to instill confidence in NFCU's clearer disclosures but depletes the assets of NFCU as a non-profit organization. Ms. Lambert's law suit disrupts public opinion in support of NFCU mission statement. Ms. Lambert's intentions are not similar to NFCU member-owners as the Settlement does not return the unassigned portion of the Settlement fund, the Residual Funds, to NFCU seemingly not equally but pro-rated as calculated to each Settlement Fund NSF check.

> Any Residual Funds remaining after distribution shall be distributed on a pro rata basis to participating Settlement Class Members who received Settlement Class Member Payments.                    *See S. para. 83(a):*

Why would someone endorse such inequality in distribution of excess funds?

Ms. Lambert's sentiments do not harmonize with NFCU's mission statement or purpose. Ms. Lambert's ability as a class action representative of one to fairly represent a class action suit is in doubt, as no other NSF fees other than $29 were represented in the *Complaint*. The Qualifying members in the National Class needs to be reduced to only represent what Ms. Lambert can actually represent. More plaintiff NFCU members could have been listed, as her counsel scouted and interviewed many NFCU customers. *Joint Declaration of Class Counsel, para. 8*. The fact she stands as one individual brings in question her perspective being representative of all the qualifying litigants.

> *Lawman comes to town*
> *Sea Captain, "No worries mate."*
> *"Wrong jurisdiction."*

### B3g    *Federal Credit Unions Proper Adjudication*

Federal Credit Unions must be adjudicated from federal credit unions, not banks. Are privately owned trolley-cars adjudicated by public railroad law or similarly owned city trolley and street-bus line cases. [However, 1800 street railroad law was thought to be different than public railroad law, but as railroad law evolved in the 1800's no distinctions were made other than the size and shape of the rail, T vs. L rails.] Both trolley-cars and public railroads serve the public, but one is owned by a quisi-public corporation, railroads; the other a municipality granted franchise. One may dissolve to discontinue service by permission of the ICC and vote of City councilmen (who may take over the trolley-car service as in Seattle, Washington), the other discontinue only by permission of the ICC/ now STB. One can only claim bankruptcy by permission of Congress, the City's bankruptcy process includes permission from their State. Differences are distinctions that need fair adjudication from similar case law.

Law suits against federal Credit Unions ought to be adjudicated from federal credit union case law entirely, not typical federal banking case law.

Like the Milwaukee Road who only after bankruptcy lost many railroad rights of way corridors to adjoining land owners as those rights of way became subject then to land-grant railroad law, such being plentiful in the higher courts of appeal and readily available to an attorney's research. Such reversions to adjoining land owners were typical of land-grant railroad holdings, a determination often turning on the meaning of words in the acquisition deeds, rather than respecting the prior owner's acquisition of such ALL at full fair market value.

This lost distinction facilitated the loss of the public trust invested to the railroads as public roads, a public interest to preserve a distinctly different kind of rail company's ownership

29

of transportation corridors from Chicago to the Pacific Northwest for future public uses; distinct from land-grant railroads over much U.S. land, even prior to the U.S. granting lands to new States. [States intervened differently to preserve portions of the Milwaukee Road rights of way corridors as such not subject to the federal Rails-to-Trails legislation, and consequently no application for such ever was made to the ICC/ STB. The ICC was Congressionally designated as only advisers to that Milwaukee Road bankruptcy court, thus tying the arms of the ICC to not grant a rail-to-trail grant to the Milwaukee Road.]

Ms. Lambert's Counsel cited to three credit union cases, one a federal credit union, *Gunther v Federal Credit Union. Gunther.*[5]

NCU's cites to nine credit union cases, *Appellate Answer ii-v*, most illustrating that re-presented payment transactions are common to the banking industry. *Appellate Answer, fn 10, p. 9-10.*

Ms. Lambert's counsel cites to far too many banking institutions rather than FEDERAL credit unions. This is EXTERNAL evidence of a practice NOT CONSISTENT with NFCU INTERNAL policies. *See Lumbermen., 732 F. Supp. at 1374.*

The concept of CONTRACT in *Lambert v NFCU* asserts including the Signed Membership Application of NFCU members that accepted the FACT that NFCU members NEED NOT KNOW AT ALL TIMES NFCU policies and procedure changes beforehand UNLESS sent a legal notice prior to such changes, which JND seemingly did. However, because the Settlement required NFCU to change many disclosures to all NFCU members, it seems **all 10 million NFCU member-owners should have received a legal notice** as implied in NFCU's waiver statement, *ID p. 1*, and given opportunity to send a letter in opposition to settlement.

> Upon verification of eligibility following submission of a completed membership application and acceptance for membership by the membership officer, and upon purchase of at least one share ($5), a Membership Savings Account will be established in your name, indicating that you are a member-owner of Navy Federal Credit Union (Navy Federal). Membership at Navy Federal comes with certain ongoing responsibilities. **By signing your original membership application, you and your joint owners(s), if any, agree to abide by the properly disclosed terms and conditions of all accounts or services that you may receive at Navy Federal.** [Emphasis added]. You also agree to keep Navy Federal informed of your current mailing address. The terms and conditions of these accounts and **services are subject to change without notice to you, unless prior notification is required by law** [Emphasis added].             *See* "Membership/ Membership/Savings/Checking Disclosure Statements", NFCU Important Disclosures p. 1, *ID p. 1.*

---

[5] "Order (Motion to Dismiss)", Gunter v. United Federal Credit Union et al, No. 3:2015cv00483 - Document 94 (D. Nev. 2017) :: Justia. https://justia.com/cases/federal/distric-courts/nevada. . . . Accessed Feb. 13, 2021.

NFCU members are not only OWNERS of NFCU, by invitation only by US military personnel and their families, but ALL AGREE to not require prior notice of NFCU policies and procedure changes by allowing NFCU flexibility that is not found in typical FICA banks.

*Long, high fly ball . . .*
*Hit along base line – hits pole,*
*Bounces fair, rolls foul!"*

## B4    OVERALL OBJECTION

### B4a    *False Statement*

This case is based on a false statement, "NFCU customers [n]ever agree to such fees", *C. para. 42-44;* and Ms. Lambert, as a share-owner of NFCU, signed an application, and given a savings account when she became a member-owner of NFCU. That is not a typical bank customer given shares in the bank they bank at:

> **By signing your original membership application, you and your joint owners(s), if any, agree to abide by the properly disclosed terms and conditions of all accounts or services that you may receive at Navy Federal**. [Emphasis added] . . . The terms and conditions of these accounts and services are subject to change without notice to you, **unless prior notification is required by law**.
> *See Complaint App. "Membership/ Membership/Savings/. . . ." ID p. 1.*

I missed viewing where contract waivers were examined in this case. I believe Ms. Lambert's waiver is critical to this case. Although some waivers are not lawful in California, Ms. Lambert's right to waive rights is respected in the State of Virginia and this Settlement.

*Citing Precedents,*
*Lawyer's briefs prevail – with no*
*Certifications.*

### B4b    *Current Judicial Summaries*

I do not yet have a handle on what the following cases all imply. However, they points to the fact that this uncertified class action case is influencing other jurisdictions. *See* https://casetext.com/case/lambert-v-navy-fed-credit-union. Accessed Feb. 9, 2021. Such influence seems inappropriate or "improper" in the English etiquette meaning of that word.

Currently, in *Chambers v HSBC Banks U.S.*, 19 Civ. 10436(ER) (S.D.N.Y. Dec. 10, 2020), the judicial summary affirmed that in a parallel case with similar terminology unambiguously permitted a credit union to charge users a fee for each "ACH debit request."

Currently, in *Wilkins v Simmons Bank*, No. 3:20-cv-116-DPM (E.D. Ark. Dec. 9, 2020) the court noted that the cases divide on the question. C.f. *Perks v TD Bank, N.A.*, 444 F. Supp. 3d. 635, 639-41 (S.D.N.Y. 2020) with *Lambert*. And recognized the complexity of the issues.

31

Currently, In *Roy v ESL Fed. Credit Union*, #19-CV-6122FPG (W.D.N.Y Sep. 30, 2020) ESL contended that the case should be dismissed as in Lambert whose contract allowed them to arbitrarily assess a fee for "each returned debit item."

Currently, in *Page v Alliant Credit Union*, #19-cv-5965 (N.D. Ill. Aug. 26, 2020) that court affirmed that several federal district courts concluded that failure to disclose claims against credit unions are preempted by the Truth in Savings Act (TISA) and/or Federal Credit Union Act (FCUA), but also affirm:

> "[T]rue breach of contract and affirmative misrepresentation claims are not federally preempted, even if the result of those claims may affect a federal credit union's fee disclosures." Lambert p 2. Citing also Lussoro v Ocean Fin. Fed. Credit Union, No. 18-cv-7400, 2020 WL 1941236, p 8 (E.D.N.Y. Apr. 22, 2020). . .

The court in *Page v Alliant Credit Union* ended up arguing what exactly was the nature of Page's claims believing that New York's deceptive business practices act is not preempted by the FCUA. *Id.*

Currently, in *Colman v Alaska U.S. Fed. Credit Union*, No.. 3:19-cv-0229-HRH (D. Alaska Apr. 14, 2020) the court determined that a similar contractual provision found unambiguous in *Lambert* may be construed as ambiguous.

Currently, In *Noe v City Nat'l Bank of W. Va*, Civil Action No. 3:19-0690 (S.D.W Va. Feb. 19, 2020)

> Defendants cite to 12 C.F.R. & 7.4003(a)—providing that "[a] national bank may change its customers non-interest charges and fees"—and 12 C.F.R. @ 7.4002(d)— providing that the Office of the Comptroller of the Currency ("OOC") "applies preemption principles derived from the United States Constitution, as interpreted through judicial precedent, when determining whether State law apply that purport to limit or prohibit charges and fees described in this section." Defendants also leans heavily on the recent decision in Lambert v Navy Federal Credit Union [citation omitted here], for its argument that plaintiff's claims are preempted by federal law. Mem. In Support of Mot. to Dismiss. at 16. Notably, the Defendant in Lambert was a federal credit union, not a national bank.          *See* https://casetext.com/case/lam bert-v-navy-fed-credit-union. Accessed Feb. 9, 2021.

Currently, In *Sanders v Y-12 Fed. Credit Union*, No. E202-00046-COA-R3-CV (Tenn. Ct. App. Nov. 5, 2020) [That was my 71st. birthday!].

> The court determined that the Contract was clear and unambiguous and had not been breached by Y-12. Moreover , the court concluded that Lambert . . . was directly on point concerning this issue. Ms. Saunders timely appealed.

What is evident to me, when previewing these cases, is that **the distinction between federal credit union policy and federal bank policy must be retained by the courts.** When

the courts lose the distinction financial institutions begin to loose diversity. It is the nature of diversity that offers stability. A sailing ship doesn't put all its weight in the hold as quick weight distribution/ flexibility is sometimes demanded. A wise stock broker or crypto investor doesn't risk all his money in one industry or for one option.

Also, it seems odd that an uncertified class action is cited by attorneys as persuasive! Certification should be a requirement to permit class action cases to be cited at all.

*Much legal reading,*
*Brings confusions, droopiness,*
*No Confucius here!*

### B5    SETTLEMENT PROVISIONS

It took me weeks to recover for my upsets and invasive thoughts. Life is full of troubles. As I read the briefs and began to understand some issues I had serious concerns:

1.   Certification,

2.   NSF Settlement Residue Funds,

3.   Uncontested High Percentage for Attorney Fees, and

4.   Banking Case Law application to Credit Unions.

*"Do unto others*
*As you want them to do you,"*
*As Confucius said.*

### B5a    *Residue Funds*

Residue Funds are dispersed UNEQUALLY by disproportionately prorating such for each resentment NSF fee (some members having more than others) rather than EQUALLY going back to NFCU for lower cost services OR proportionately to each member-owner recipient of Settlement Funds. *See para. 75 (c):*

> c. The Net Settlement Fund will be allocated pro rata to the Settlement Class Members based on their number of Relevant NSF Fees.

Such disbursement seems not fairly EQUAL to class members. Such rewards the poorest manager of checking accounts more than others!

*Legal Notice,*
*Class action Opts-In clients,*
*To waive people's rights.*

### B5b    *ADA Loan Fund*

Residual Funds need to be returned to NFCU or better – create a new NFCU service.

In the interest of Ms. Lambert assisting those who presumably similarly suffered financially due to resentment NSF fees, it is my suggestion that any Residual Fund be assigned

33

to a new perpetual NFCU 0% interest **ADA Loan Fund\*** to be available first to any NFCU Settlement member who received a Legal Notice and suffers a permanent disability, then to any NFCU member-owner, whether a Settlement Fund recipient or not.

NFCU Settlement members could make qualifying applications to opt into the ADA Loan Fund to pay-off NFCU loans and NFCU credit card debts, especially during Covid. Such ADA Loan Fund may help the disadvantaged needy to more easily escape the chains of debt when the need arises, as many are not employed or self-employed to receive governmental relief at this time. There may be a larger than expected need among NFCU member-owners who are military families with disabilities. ALSO, Settlement Members could opt to designate their Settlement funds to the ADA Loan Fund rather than receive far less meaningful automatic deposits to their accont. Such depends on mutual Counsel's approval but seems more advantageous than NFCU managing and paying for dispersion of the Residual Fund pro-rated to all Settlement fund NSF checks, not recipients. Of course a late payment for a third missed monthly payment could revert the remaining balance of loan, for the remaining duration of the loan, to the qualifying interest rate on the applicant's applications for ADA Funds. Such seems more meaningful.

*Aging Attorney*
*Composing briefs for the court.*
*Composting papers.*

### B5b        Limiting NFCU Future Litigations

Concerning limiting NFCU's waiver of right to seek recovery of administrative costs upon termination of Settlement, *S. para. 98*, Justice Scalia, in 2011 delivered an opinion of the U.S. Supreme Court that:

> Because Rule 23 cannot be interpreted to "abridge, enlarge or modify any substantive right," *Wal-Mart Stores, Inc. v Dukes, et al.,* 564 U.S. 338 (2011)] p. 26—27. 603 F. 3d 571 reversed.

Consequently the Settlement ought not limit NFCU from litigating against JND's administrative costs relating to mismanaging full pre-payment of USPS First Class Postage for noncomplying legal notice postcards. USPS 604 DMM 5.3.5. An reduction or payment from the Settlement fund would compensate NFCU for the unnecessary payment for the substandard service.

*Long, high fly ball . . .*
*Hit along base line – hits pole,*
*Bounces fair, rolls foul!"*

34

### B5c    Settlement Para. 89 – Attorney Fees
#### B5ci    Generally

Since Feb. 12, 2021 I have not been able to open JND's Feb. 9, 2021 posted briefs until the afternoon of Feb. 19. Reading such is laborious, as it recites much and perpetuates hiding the facts that would discredit the standing of Ms. Lambert. I agree with Counsel that the results obtained in a law suit are grounds for remuneration:

> The "most critical factor in determining the reasonableness of a fee award is the degree of success obtained." Carroll v. Wolpoff & Abramson, 53 F.3d 626, 629 (4th Cir. 1995) (citations and quotations omitted).    *See PMFFA p.* 6.

However, requests for attorney fees most often come after a successful litigation, not in a Settlement: and if after a Settlement, after certification is discovered and affirmed by a court, rather than certification conceded for the sake of settlement. There was no motion for certification presented to the court in Lambert v NFCU. I believe Ms. Lambert may potentially not be certified due to her undisclosed signed waiver of right to be informed. However, knowing that, the litigation was successful in convincing NFCU to change their disclosure statements. Their claim is understandable though not established on similar federal credit union nonprofit organizations as much as the weight of the for-profit federal banks argued. I do not think *Carrol v Wolpoff* should carry influence when no certification is affirmed by a court.

Mrs. Lambert's Counsel's litigation has added value to the clarity of disclosures of NFCU to its member-owners, and some level of fee award is justified for that labor.

However, the Settlement, para. 89, asserts that NFCU may not contest Ms. Lambert's Counsel's request for 33.33% of the Settlement fund plus other expenses and costs.

Such a provision does not relieve this Court from properly justifying the award. Typically courts allow 25% of the Settlement fund for attorney fees, **but a comparison of Lodestar and percentage must be evaluated as to some level of equality of outcome.** Just because everyone else does something doesn't make it right. I could not discern if the acceptable Lodestar multiplier rate of 6.11, *S. p.18-19,* was **based on successful litigations** with actual Certifications and Success at trials, not necessarily settlement agreements. I think the Lodestar multiplier needs to be much lower in **settlement agreements with no motions for certification.** Plaintiff could have made that motion, but I suspect they knew it was a hidden weakness. I think maybe the 2011 25% benchmark is reasonable given the doubt about member-ownership distinction, the

35

potential dis-similar, analgorous NFC classes included in Settlement members; and California legislated upturning 4000 years of contract law without other State's approval!

> The benchmark percentage for attorney fees award in class action seems to be 25 %. *Bluetooth Headset Products Liability Litigation v GN Netcom, Inc.; Motorola, Inc., Plantronics, Inc.,* 654 F.3d 935 (2011).

> Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar. Applying this calculation method, courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award, providing adequate explanation in the record of any "special circumstances" justifying a departure. *Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990); *Powers v Eichen,* 229 F.3d 1249, 1256-7; *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989).
>
> *See Bluetooth 654 F.3d at 942.*

The departure from 25% "must be exercised so as to achieve a reasonable result." As some percentages of large recoveries are not a direct reflection of the work on the NFCU case, especially since Ms. Lambert's Counsel refers to the commonality of NFCU agreements among the Membership class, *PMISOF para. 64.*

> *See In re Coordinated Pretrial Proceedings,* 109 F.3d 602, 607 (9th Cir.1997) (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1294-95 n. 2 (9th Cir.1994)).     *See Bluetooth 654 F.3d at 942.*

And even if other methods are used, such must not exceed the 25% benchmark:

> Several courts have embraced the constructive common fund approach, warning that "private agreements to structure artificially separate fee and settlement arrangements" should not enable parties to circumvent the 25% benchmark requirement on "what is in economic reality a common fund situation." *In re Gen. Motors,* 55 F.3d at 821; *Johnston v. Comerica Mortg. Corp.,* 83 F.3d 241, 246 (8th Cir.1996).
>
> *See Bluetooth 654 F.3d at 943.*

> Just as the lodestar method can "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate," the percentage-of-recovery method can likewise "be used to assure that counsel's fee does not dwarf class recovery." *In re Gen. Motors,* 55 F.3d at 821 n. 40. "If the lodestar amount overcompensates the attorneys according to the 25% benchmark standard, then a second look to evaluate the reasonableness of the hours worked and rates claimed is appropriate." *In re Coordinated Pretrial Proceedings,* 109 F.3d at 607.
>
> *See Bluetooth 654 F.3d at 945.*

And the percentage must be reasonable:

> Third, even though a district court has discretion to choose how it calculates fees, we have said many times that it "abuses that `discretion when it uses a mechanical or formulaic approach that results in an unreasonable reward.'" *In re Mercury Interactive*

*Corp.*, 618 F.3d at 992 (quoting *Powers*, 229 F.3d at 1256).And, even a Settlement Agreement may not waive the Court's assessment to justify the fee award. *Id. 944.*

But a defendant's advance agreement not to object cannot relieve the district court of its duty to assess fully the reasonableness of the fee request. *See Staton*, 327 F.3d at 963-64; *Knisley*, 312 F.3d at 1125.              *See Bluetooth 654 F.3d at 943-4.*

Give that all costs typically come from a plaintiff's requests for fees and costs, Lodestar calculation, the percentage calculation seemingly should include all the JND administrative costs rather than such being paid separately and in addition to by NFCU. *S. p. 66, 42*. The public has a right to know the actual expenses paid by its member-owners. **The inclusion of those expenses would seemingly adjust the Lodestar upwardly**.

I could not determine from Ms. Lambert's counsel's list of cases that received 33% fees which were settlement cases, and which were actual victories cost percentages. Also, I could not determine which were settled after certification and which before. I presume settlement percentages are likely less in settlements without certification. *MISOF p. 12*.

There also needs to be an adjustment in the Attorney Fees granted, especially since reasonableness is getting paid the exact same wages as Settlements with proven certification. Minor league players don't get paid major league wages, and small class action settlements of under 12 million ought not get paid the same percentage as 50—40 million dollar settlements. There simply is a lack of work. Presuming justification on the basis of what a ball player is paid, rather than the way he plays, and the public support he generates are important public considerations.

> *Lawyer's costs and fees,*
> *Grinding away costly briefs,*
> *Expresso coffee.*

### B5cii   Value of Lodestar
And the fees must reflect the actual VALUE of benefit paid to settlement class members!
There is value of reimbursing resentment NSF fees **once maybe twice** for each consumer, but to reward those who do not avail themselves of NFCU's fee based overdraft protection, or free checking lines of credit, or checking balance assistance seems of little value. It is like throwing extra bones to dogs who bury them. It is a waste of NFCU money that could be used to **provide FREE check balancing assistance**, *S&F p. 1,* OR automatic **free 25 dollar free checking line of credit** for all who have more than two resentment NSF fees. That end result has more value to the individual and larger NFCU membership.

It is imperative that in determining attorney fees, that counsel show that the VALUE of settlement is justified to the common class:

> *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D.Cal.2009) ("[T]he standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." (citing *O'Keefe v. Mercedes-Benz USA, LLC,* 214 F.R.D. 266, 304 (E.D.Pa.2003))).
> *See Bluetooth Headset Products Liability Litigation v GN Netcom, Inc.; Motorola, Inc., Plantronics, Inc.*, 654 F.3d 935 (20111).

The Settlement may justify the VALUE of cash dispersed based on the fact that all non-dispersed funds are dispersed to qualifying litigants by a pro-rated calculation. *S. para. 76-79.* Such would REWARD those with NSF fees more than NFCU members with none. IT IS NOT FAIR to reward extra funds to NFCU members for their NSF checks more than ALL members/ opted in, excluded/ or opted out of settlement members. If NFCU members were customers maybe, but such a reward system takes from one partner to give to the other funds that deplete the low cost benefits of NFCU to members. This is of NO VALUE to share member-owners, i.e. class action recipients.

Courts consider two common law principles for granting rewards and attorney fees when no statute is provided. *Serrano v. Priest,* 569 P.2d 1303 (Cal. Sup. Ct. 1982) reasoned:

> The first of these is the well-established "common fund" principle: when a number of persons are entitled in common to a specific fund, and an action brought by a plaintiff or plaintiff's for the benefit of all results in the creation or preservation of that fund, such plaintiff or plaintiffs may be awarded attorney's fees out of the fund." See, e.g. *Estate of Stauffer* (1959) 53 Cal.2d 124, 132 [346 P.2d 748]; *Estagge fo Reade (*1948) 31 Cal.2d 669, 671-672 [191 P.2d 745]; see generally 4 Witkin, Cal. Procedure (2d ed. 1971) Judgments, @@ 129—133, pp. 3278-3283.) The second principle or more recent development, is the so-called 'substantial benefit' rule: when a class action or corporate derivative action results in the conferral of substantial benefits, whether of a pecuniary or nonpecuniary nature, upon the defendant in such an action, that defendant may, in the exercise of the court's equitable discretion, be required to yield some of those benefits in the form of an award of attorney's fees. (See, e.g., *Knoff v City Etc. of San Francisco (1969 1 Cal.App.3d 184, 203-204 (81 Cal. Rptr. 683): Fleltcher v . . . .*

If principles of common law can justify attorney fees when no legislated provision, the same may justify this court assigning reasonable rewards when appropriate.

Application of any principles of law must make sense in any new context.

> Whether a legal "principle" used in one context (a statutory fee case) is logically applicable in a different context (a *common fund* case) depends on whether *the principle* makes sense in the new context.                *See In re Washington Public Power Supply Sys. Lit.,* 19 F.3d 1291 (9th Cir. 1994).

38

Although the cited case law here is not contemporary, or Virginia case law, the overriding concept is relevant: Loadstar and Percentage calculations are roughly equivalent and in the same ballpark – **not one along the first base line and the other off the outfield fence.**

The application of land-grant railroad abandonment of railroad rights of way easement principles really did not make sense to apply to railroad rights of way acquired at full market value by non-land-grant benefited railroad companies, i.e. The Chicago, Milwaukee, St. Paul and Pacific Railroad entities [hereafter The Milwaukee Road]. Evidenced by The Milwaukee Road's 70 attorneys never losing an easement abandonment claim when The Milwaukee Road proved to the courts that all their acquisitions were at full market value:

> The Chicago, Milwaukee & St. Paul Railway Company is a corporation of the State of Wisconsin, formed and organized under its general statutes by the purchasers at a foreclosure sale of a portion of the La Crosse & Milwaukee Railroad. . . The foreclosure of the mortgages given by the La Crosse & Milwaukee Railroad Company and the organization of a company by the purchasers, was one of the early foreclosures of that kind in the history of this country, and was the first case where the foreclosure and organization of the company were thoroughly contested in the United States courts and finally decided by the Supreme Court. Such foreclosures and sales have, since that time, been of frequent occurrence . . . [legal documents of The Milwaukee Road] together with the proceedings in court to foreclose the same and perfect the title of said property, which will be found in the chapters next following.
> *See* Cary, John W. (General Counsel), The Organization and History of The Chicago, Milwaukee & St. Paul Railway Company. © 1981 reprint of 1893 ed. New York:Arno Press. p. 5, 13.

Such private owned railroads are different from government subsidized railroads, whose land grant lands were held by the courts as granted as contract rewards for completion of rail construction before deadlines. What is little know is that the Congressional discussions and reasoning for such land grants to the Northern Pacific were given because after the Civil War economist were predicting an economic bankruptcy of the United States due to the high tariffs and duty fees paid by the U.S. to Canadian railroads.

Different banking ownerships are new CONTEXTS and are entitled to be litigated from similar case law. Not as Lambert's counsel reasoned, from all banking case law.

*Big Bro's successful.*
*Boy follows his best hero,*
*Loses cash gambling.*

*B5ciii        Attorney Safeguards Lacking*

39

There might be no reward to Ms. Lambert's Counsel if this class action was unsuccessful.

Money motivated attorneys in Colonial Virginia were called "mercenary attorneys" and were forbidden or fined for extracting extra remunerations from clients for legal services:

> ["WHERAS many troblesom suits are multiplied by the unskillfulness and coveteousness of attorneys, who have more intended their own profit and their inordinate lucre then the good and benefit of their clients: Be it therefore enacted, That all mercenary attorneys be wholly expelled from such office, except such suits as they have already vndertaken, and are now depending, and in case any person or persons shall offend contraty this act to be fined at the discretion of the court."].
> *See* Hening, Laws of Virginia, November 1645—20th Charles 1st, Vol. 1, p. 302, Act VII.

Of course such was, as in modern day Settlements, when there was no appeal to the King of England, any court of appeal. Similarly, in settlements between attorneys for a class action, when there is no appeal possible to the Court, some entity must have a check and balance foreplay on attorney agreements. This is especially true when attorneys agree to not contest higher than publically expected attorney fees and costs. *S. para. 89.*

I saw no reference to the shareholder's appointed representative, NFCU board members, actually granting their attorney approval to accept the settlement. With no such disclosed assurances how can NFCU members comment appropriately? There must be some kind of checking system to protect the public interest.

The public trust doctrine of the courts to protect its cultural resources and commerce could be expanded to apply to economic stability agencies and their purposes, the Federal Reserve System, the SEC, FINRA, FDIC, NCUA, etc. Such were created to insure the people of financial institutions stability. They could play a part in banking class action suits, Other than simple offering ex parte briefing on aspects of the law, they could sit in on negotiations for settlement as a regulatory agency.

In the 1800's, before successful bankruptcy law existed, public trust doctrine was applied in bankruptcies by courts to equally treat mortgage holders of business property equally as debt holders. Such prospered commerce equally rather than modern bankruptcy laws that favore debtors being paid before commercial mortgage holders or business lenders. Sad. My father sold one of his businesses to an individual who sold his inventory and that of creditors and then declared bankruptcy. My father never got a cent paid him for contract. Not a crime in bankruptcy court that originally intended to stops creditors from collecting debts by taking the tools of production from the tradesman. Those intentions were by American legislation. Later my father's

business front doors were chained by police. We survived and I was told that we were the first business to ever pay back a loan from the Spokane Better Business Bureau.

When attorneys negotiate a Settlement that jeopardizes commercial stability of the assets of a nonprofit organization, such rocks the greatest contributor to our economic prosperity. That contributor is not the government but nonprofit organizations' contributions. NFCU's ability to contribute is encumbered by this lawsuit and its fallout affecting our military families and heroes. There must be a check system in play.

Possibly the Court could restrain or forbid such class action suits in the future without the appropriate regulatory agency's approval asserting the evidential proof of the facts are certify and that an unresolved problem with their governing agency exists. This Court needs assurances regarding factual truths prior to any Settlement's approval.

*Colonial Times,*
*Little Red hooded lass killed,*
*Real wolves in woods.*

*B5ciiii       Excessive Attorney Fees*

In 1642 the Commonwealth of Virginia granted half the fine for informing the Court of attorney improprieties of taking additional sums of money or love from a client over and above the amount of tobacco (1600's common monetary unit of exchange in Commonwealth) designated by the court. *See* Hening, Laws of Virginia, Vol. 1, MARCH, 1642-3—18th CHARLES 1st, Act LXI, p. 275:

> [Colonial English text]    ACT LXI. **Be** it also enacted for the better regulating of attorneys and the great fees exacted by them, that it shall not be lawfull for attorney to plead causes on behalfe of another without license or permission first had and obtained from the court where he pleadeth, . . .[setting limit on number of courts an attorney may practice, And limits on the fees extracted for specific petitions and pleadings] . . . And if any attorney shall transgresse against the premises, or shall take above the severall sums aforesaid either by gift or love directly or indirectly, such attorney for such offense ina countye court shall forfeit 500 lb. tobaccoe, And for such offence in quarter court shall forfeit 2000 lb. of tobaccoe, one moyety whereof shall be and come to the King, and the other moyety or halfe to the informer, whether it be client or adverse party, or any other person whatsoever, and may recover the same by action of debt in the severall courts respectively, And it is further thought fitt that no attorney licensed as aforesaid shall refuse to be entertained in any cause as aforesaid, provided he be not entertained by the adverse party, vppon forfeiture of 250 lb. of tobacco in a countie court, and 2000 lb. of tobaccoe in the quarter court one moyety whereof shall come to the King's majesty and the other halfe to the informer aforesaid, Provided this act nor any penaltie therein expressed extend to such who shall be made speciall attorneys within the collony or to such who shall have letters of procuration out of England.

Because attorneys belong to a particular club of elite people of our society, I think it wise to again restrain the agreements between such. In my experience in Washington State it is commonly known that one elected politician acquired a retired State ferryboat by circumventing the laws that such be sold at public auction. In my State the person after negotiating a long term-low price contract sale of the Bonneville Power Administration's for electricity sold to California quit her job and went to work for the firm she negotiated with. In my State, an attorney moved to my community and laid low when his compatriots, attorneys, were sent to prison. In my town an attorney took love from a client, was sentenced and upon release, by grace, practices law again. Attorneys are an elite moiety of our society that may occasionally make agreements that are to the detriment of society's values at that time in history. A check on potential poor decisions of attorneys when dealing or negotiating large funds greater than their yearly wages, ought to be in place, i.e. say for a reasonable length of time not being able to be scouted for employment or paid board memberships of organizations associated with any law case that involved them.

I don't trust Settlements of class action suits to always be fair to the greater public interests at stake entrusted therein. Attorney fees MUST be reasonably adjudicated by this Court rather than by mutual agreement to not protest when in excess of the standard.

*In class action suits,*
*Opposing letters get a . . .*
*Pro—Rated reward!*

### B5d    Ms. Lambert's Reward

I also saw no evidence that Ruby Lambert attempted to have the NCUA resolve the issue prior to this class action suit.

I did I see Ms. Lambert present evidence that she attempted to resolve the issue amicably with a phone call to NFCU's customer service.

In fact, I saw no evidence that Ms. Lambert took normal precautions for a solution to her NSF fees.

The Class Representative failed to choose to have a checking *Line of Credit* account attached to her checking account at no cost to her to help her manage NSF 29 dollar fees, and to lower NSF fees to ten dollars when in excess of the 500 dollar *Line of Credit. S&F p. 1.*

The Class Representative failed to create any *overdraft protection* that lowered the NSF fee to 20 dollars.    *See* "Miscellaneous Checking, Checking Protection. . . ." *S&F p. 1.*

The Class Representative is suspected to not avail herself of a NFCU benefit of personal help balancing her checkbook, a five-dollar cost. *Id.*

42

The Class Representative failed to bring the issue before NFCU's annual membership meeting for a membership consensus or opinion concerning the supposed abuse. *See NFCU's Special Disclosures, p. 1.*

Such non-disclosure seems deceptive and misleading as to what kind of membership she actually represents. The neglect seems untypical of other NFCU class members.

The Class Representative also failed to disclose that she had a NFCU credit card. Owning such granted NFCU special privileges and accepted "all its terms and conditions":

> **Request for Information** If approved for a Navy Federal (NFCU) Credit Card, use of the card demonstrates **my/our consent to all its terms and conditions**, [emphasis added] including the Security Interest Specific for Credit Cards provision, which reads: I/We acknowledge and pledge, specifically as a condition of my/our use of the credit card, that I/we have voluntarily granted NFCU a security interest in all of my/ our individual and joint share accounts at NFCU. If my/our credit card loan becomes delinquent, this security interest may be used without further notice to pay all or part of such delinquency. This security interest does not apply to shares in an Individual Retirement Account (IRA). *ID p. 7.*

Such non-disclosures are misleading as to what kind of "similarly situated" plaintiffs she represents.

It seems like a great disregard to the long history of courts requiring first an attempt at personal resolution and then administrative appeal process if available prior to filing legal action, let alone a class action suit. My goodness, a special meeting of member-owners could have been called to vote for a solution.

I saw no evidence that Ms. Lambert did the pre litigation work necessary or typical for courts to respect her efforts enough to reward her $5000 dollars. Let her prove to the court her expenses and efforts, besides reading material given her by counsel. Such documentation could justify the reward. I can't justify it in light of the Federal and Virginian minimum wage laws of $7.25per hour prior to 2021. *See* "State Minimum Wage laws," DOI Wage and Hour Division. www.doi.gov. Accessed, Feb. 21, 2021.

I also saw no evidence that Ruby Lambert attempted to have the NCUA resolve the issue prior to this class action suit. Nor did I see Ms. Lambert present evidence that she attempted to resolve the issue amicably with a phone call to NFCU's customer service.

I saw no evidence of Ms. Lambert attempting to contact the NCUA who regulates NFCU and encourages direct public input:

> The NCUA's goal is to ensure that all of our regulations are clearly articulated and easily understood. Comments are welcome on that aspect, as well as substantive suggestions for regulatory changes. Comments may be e-mailed to

OGCMAIL@NCUA.GOV or mailed to Regulatory Review (2020), Office of General Counsel, National Credit Union Administration, 1775 Duke Street, Alexandria, Virginia 22314. . . . In addition to the periodic review described above, the NCUA may review or revise regulations through processes outside this periodic review. . . ."

*See* "Regulatory Review, Rules and Regulations" Regulations and Supervision. National Credit Union Administration, Virginia. last modified 2/21/2020. www.ncua.gov. Accessed Feb. 6, 2021.

A Google search would have afforded Ms. Lambert discovery of NFCU's regulatory agency. It seems like a great disregard to the long history of courts requiring attempts of personal resolution and an administrative appeal process (if available) prior to filing legal action, let alone a class action suit. My goodness, a letter to a CEO is often effective for me.

I also saw no evidence that Ruby Lambert attempted to get additional litigants listed with her in this class action.

I also saw no evidence that Ruby Lambert did the typical preliminary litigation leg work typical for courts to respect her efforts enough to reward her $5000 dollars. If she represents only herself and a 29 dollar NSF fee interest what extra did she do, being recruited for this legal action? Let her show this court her court attendance expenses and related litigation costs in a leger of actual related incurred expenses that are recoverable in other class action suits. Such a document would inform this Court to validate or justify a $5000 dollar reward.

I've done more work than Ms. Lambert. This Court could consider granting me a similar or greater reward for giving voice to represented objections from silent members of the qualifying class in the interest of helping to support our military heroes and families. I expended nearly 300 dollars in printing, postage, as my printer broke and I had to acquire another. If this Settlement had stated an electronic option to filing electronically, rather than requiring a mailed service, these costs would not have been incurred. Why should objections be required to serve differently than Ms. Lambert? What is legal service is known, but not affirmed as "any other legal service." Counsel could file electronically any other clients briefs, why not an Objection to Settlement Letter. There are tabs on electronic court filing systems for "other filing" and "letter." This reimbursement is potentially significant since no *Letters of Opposition to Settlement* were received by Counsel prior to Feb. 9, 2021. *PMFFA p. 11:*

No objections to Settlement have been filed, let alone objections to the request for attorneys' fees, costs or Service Award. Should any timely objections be received after the filing of this motion, Class Counsel will file a separate response.

Yet it is more beneficial to the Opposition letter senders if a reward was prorated. And, it is even more significant if all *Opposition Letter* writers/ researchers, receive from any class

44

action Settlement Fund a court ordered reward portion of funds saved – prorated equally to plaintiffs submitting letters in opposition to settlement. The letter could say something akin to:

> *In appreciation for you letter of opposition to Settlement in Lambert v NFCU, and, because one such letter requested a reward equal to or greater than the scheduled reward for Plaintiff's Representative, Ms. Lambert, to be prorated to all opposition letter writers equally.*
>
> *I am pleased to inform you that the justices of The United States District Court for the Eastern District of Virginia, Alexander Division, unanimously approved disbursement of _____ dollars to the ___ opposition writers. Your letters made a difference.*
>
> *This action is a new precedent for any national class action lawsuit to which you were made a part. Thank you for your service to the better interests and enrichment of the people of the United States and Virginia. Enclosed you will find a check for your contribution.*
>
> *Respectfully,*
>
> *Counsel for NFCU.*

*Wrong Postcard printing. Suspect mail activity, USPS paid.*

## B6 . MISCELANEOUS OBJECTIONS
### B6a    Counsel's Ethics
Ms. Lambert was scouted by her counsel to represent a NSF claim.

> Before filing suit in this case, Class Counsel spent many hours investigating the claims of several potential plaintiffs against Navy Federal. Class Counsel **interviewed a number of customers and potential plaintiffs** [emphasis added] to gather information about Navy Federal's conduct and its impact upon consumers. This information was essential to Class Counsel's ability to understand the nature of Navy Federal's conduct, the language of the Account agreements at issue, and potential remedies. *JDC* para. 8.

NFCU counsel pointed out this was the 13th case Ms. Lambert's counsel brought against banks. *See Appellate Answer, fn #10,p 9-10.*

It must be assumed, but doubtful, that counsel read NFCU Important Disclosures p.1. If they did Ms. Lambert's counsel in the Commonwealth of Virginia had a responsibility to advise Ms. Lambert the potential loss to her of NFCU services and the understanding that she was a share-member owner of NFCU and not a typical "customer." (ID p.1). The Virginia Rules of

Professional Conduct require that attorneys be thorough in their inquiry concerning the factual basis of a complaint:

> Rule 1.2 Competence[:] A lawyer shall provide competent representation to a client. Competent representation requires . . . thoroughness and preparation reasonably necessary for the representation.
> Rule 1.2 Comment [5] Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. . . .
> Rule 1.2 Comment [9] A lawyer is required to give an honest opinion about the actual consequences that appear likely to result from a client's conduct. . . .
> Rule 1.3 Comment [2] Additionally, lawyers have long recognized that a more collaborative, problem-solving approach is often preferable to an adversarial strategy in pursuing the client's needs and interests. . . The client can be represented zealously in either setting.

From Ms. Lambert's *Complaint* it does not appear that they did disclose these facts, if they read them; OR Ms. Lambert's counsel did not perform the research necessary to discover the facts that distinguish NFCU member-owners from typical bank customers, having signed a waiver of right to be perpetually informed of NFCU changes in policies and procedures.

For that reason Ms. Lambert' counsel must not receive 33% but 25 % of the Settlement fund. They did not ethically earn it.

And, the attorneys who signed Ms. Lambert's complaint affirmed that they knew or agreed to the potential truth of "**NFCU customers [n]ever agree to such fees**!" The attorneys who composed such a blatant misrepresentation of the truth in Ms. Lambert's *Complaint* should be disciplined for unethical omission to inform their client by not representing the best interests of their client in violation of the Rules of Professional Conduct, Rule IV (B):

> Acts of omissions by a lawyer admitted to practice before this Court, individually or in concert with any other person or persons, which violate the Rules of Professional Conduct adopted by this Court shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the courts of an attorney-client relationship. The Rules of Professional Conduct adopted by this Court are The Rules of Professional Conduct adopted by the Highest court of the state in which this Court sits, as amended from time to time by that state court, except as otherwise provided by specific Rules of this Court after consideration of comments by representatives of bar associations within the state.

For attorneys to hide behind allegations presumed to be true in the *Complaint* and affirm that they did adequate research to the nature of the facts, must not be rewarded in this case, no matter how well they argue the law.

46

I was excessively upset about the low lawful standard of ethics of an attorney's pursuit of resolution of a problem rather than monetary gain for scouting litigants for continued class actions for similar case scenarios. Case law builds upon itself, and sometimes wrongly so.

Usually when I seek to borrow a friend's car, Ms. Lambert, and something goes wrong while I was borrowing the car, I ethically must pay for the repair. However, if it was a friend's idea for me to borrow a car, and the car breaks down, ethically it is the friend who carries the burden of repair. However, Ms. Lambert, who was interviewed and sought out by her Counsel, carries the potential loss of NFCU benefits and any potential counter suit for the gross misrepresentation of her signing a waiver of right to be informed regarding NFCU's policies and procedures. Her ignorance is not the veil her counsel may ware to hide their ethical responsibility. Counsel must be disciplined by this Court for perpetuating so great a cost to NFCU in pay for DNJ's administrative costs for a Settlement, and this frivolous lawsuit..

When I grew up my neighbor's parents were attorneys and were forbidden to advertise, so they often ran for public office. It seems like a legal firm seeking clients today is the unchecked practice, but in truth the public does not approve. It clutters public buses and billboards, propagating, propagandizing, and creating America as a litigious society. As an artist I know historically that art images inspire change, and are the first action to create change. What we can imagine today we realize in the future. I believe the modern advertising standard of attorneys repulsive if not a violation of their public oath of office to serve, not exploit some like predators. I know that expressing my opinion on this matter is primarily targeted at class action litigation firms, as change must come especially to the proactive class action litigation States like California, as well as non-proactive class action States like Virginia.

The accepted legal practice of **one class member representing the whole is like a blind man describing an elephant.** It is often inadequate to presume he represents the real truth, or as Paul Harvey would often say, "And now for the rest of the story."

*Searching for money,*
*700 dollars per hour,*
*Lawyers find victims.*

### B6b   NCUA Agency

It is my opinion that no *Settlement* ought to be endorsed by this Court when the regulating/ approving credit union agency, **NCUA, was not made a part to the suit**. However, they are the regulatory inspectors of NFCU's compliance to their rules.

47

"The NCUA was created by Congress in 1970 to regulate federal credit unions. *See:* Bieber, Christy R. "What is the NCUA? Updated Dec. 4, 2020. www.creditkarma. com>advice>nc....Accessed Feb. 6, 2021.

A class action without an attempt to change the regulatory rules and procedures does not seek a solution to the problem for all federal credit unions and seems an unethical legal practice of recruiting victims for more monetary gain. This is a public concern. Counsel claims

This case does not raise serious public policy concerns. *PMISOF p. 14.*

The quickest resolution to government agencies properly reviewing banks and credit unions policies for clearer disclosure compliances APART FROM cluttering the public funded court time is a public concern. Not just from an ethical attorney practice perspective, an economic burden on the public treasury, and an ineffective solution to the larger national problem left unresolved in a national class action suit.

> *Class Action Law Suit.*
> *Clients settle out of court,*
> *Mistakes found too late?*

## IV.    IDENTITY OF ALL COUNSEL EVER REPRESENTING ME

No counsel ever represented me in court in a civil matter other than an appointed litigation guardian, Lawrence E. Freeman WABA 34363, 325 East Washington St. #214, Sequim, WA 98382, who did a service for the Superior Court of Clallam County, Washington State concerning a property/ railroad issue where counsel affirmed to the court, in court and litigation report, that he did not represent me. He recommended certain issues in my long Complaint not be entertained.

Over 10 ten years ago, an attorney, Craig L. Miller PS, 711 E. Front St., Ste. A, Port Angeles, Washington 98362, did hold in trust moneys for litigation with the Washington State Department of Natural Resources in regard to my three mile undeveloped Milwaukee Road railroad holding. Counsel's apprentice, a California attorney waiting to pass the Washington Bar, withdrew advocacy work for me. Since then Mr. Miller has assisted me with occasional clarifications on court procedures and public documents. A retired David V. Johnson Atty. WSBA #6194, 804 South Oak St., Port Angeles, WA 98362-7740, previously did one hour paid research for me regarding a small 120 sq. foot County Foreclosure Tax Deed - fee ownership claim for a portion of Milwaukee Road railroad holding located in Port Angeles.

The NW Justice Project CLEAR Project did assign me an attorney, Andrea Kelso, to assist with the GR 33 portion of my Complaint when before the Washington Appellate Court

concerning a State GR 33 Disability Accommodation Request for an appointed attorney denial. She did email me and have a phone conversation but never draft any portion of a document or appear in my behalf. She withdrew her assistance.

I use to belong to Pre-Paid Legal for over ten years, and paid a monthly fee until they refused to renew my membership. They limited their help in Washington to only occasionally write one letter representing me on about five different legal concerns.

A public defender from the Clallam County Public Defender's office also was assigned to represent me in a criminal charge that was both plea bargained and expunged.

> *Man eating Cheerios.*
> *Looks at his sweet honey . . .*
> *Daily growing fat.*

### V.    OBJECTIONS TO CLASS ACTION SUITS

I have no objections to class action in the last five years or my lifetime. I was awarded compensation in a computer class action suit but never filed objection or claimed entitled goods.

> *Handball player*
> *Told, "Bank your shots more often."*
> *Mails balls an' wads to bank.*

### VI.    AGREEMENTS WITH COUNSEL

The only agreements I may have with current counsels is one I imposed on JND and counsel for both parties regarding a claim for a reward for disclosing USPS FIRST CLASS MAIL postcard's improper indicia for LEGAL NOTICE requiring an estimated additional 29—40,000 dollars [rev. $42,296.96] to be paid the USPS as lost revenues. JND could fix the problem prior to the Settlement's approval hearing, Friday, March 26, 2021. I suggested JND, counsel or NFCU reward me 10% of any cost savings to vested parties for the oversight and NFCU reward me 10% of Settlement savings to them for reduction to the Settlement Fund or its related costs. *See App D & F*. And, this court reimburse me my 200 dollar costs, *App. A-2*.

> *Children in garden.*
> *Today pulling up mom's new plants,*
> *Inspecting the roots.*

### VII.    COUNSEL TO APPEAR ON MY BEHALF

No Counsel to appear in my behalf. What I have written I have written.

> *Computer blinders,*
> *Muffle noise, keeps out bright light,*
> *Some men like the dark.*

## VIII.   HISTORY OF COUNSEL OBJECTIONS

There is no history to dress up this report regarding prior counsel objections.

*In courtroom, "Hear Ye!"*
*"Hear Ye! Will you all please rise."*
*"No service today."*

## IX.   LIST OF PERSONS CALLED TO TESTIFY

No persons will be called to testify in support of my objections.

*One young attorney*
*Calls doctor to testify,*
*Ultra vireses.*

## X.   REGARDING PERSONAL APPEARANCE

I do not intend to attend in person any hearing. I have stage IV Renal Failure and am at a higher than normal risk for corona virus complications. No corona virus immunization shot has been yet recommended for me by my kidney doctor as of yet.

*Man waits in long line,*
*Court clerk won't stamp his filing.*
*Leaves stamping de-feet.*

## XI.   SIGNATURE

On the _____ day of February, 2021, I, Ronald W Erickson of his own free will, in service to God, Country and fellow NFCU member-owners composed and signed this class action *Objection to Settlement.*

**AND DECLARE** under penalty of perjury under the laws of Washington State, the Bible, and the United States Constitution that the forgoing is true and correct.

DATED this 24th day of February, 2021

_____
Ronald W. Erickson, pro se

*Purple Iris bloom.*
*They grow well as heirloom plants.*
*Small boys piss on them.*

50